TAYLOR KIRK v. THE TERRITORY OF OKLAHOMA.

(Filed March 23, 1900.)

1. CONTINUANCE—*Application Overruled—Discretion of Court.* It is no abuse of discretion to overrule an application for continuance where no diligence is shown to procure the attendance of resident witnesses, or to take the depositions of non-resident witnesses.

2. WITNESS—*Character—Expression of Judge—Error.* It is error for the trial judge during the trial of one accused of murder to express, in the presence of the jury, an opinion as to the character or credit of a witness.

3. MURDER—*Trial—Defense—Weight of Evidence—Instruction.* On a trial of one charged with murder, where the killing is admitted, but the plea of self-defence is interposed, and there is any evidence, however slight, tending to support such plea, the court cannot weigh such evidence, but must, when requested, submit an instruction properly embracing the law of self-defense, and stating under what circumstances the defendant was not required to retreat; and it is error to refuse such an instruction unless the subject is properly covered by the general charge.

4. CRIMINAL LAW—*Self-Defense—Instruction—Error.* As to whether the circumstances attending the killing were such as to require the de-fendant to retreat before firing the fatal shot, was a question of fact for the determination of the jury; and the court had no right to assume that the facts proven made it his duty to retreat; and the giving an unqualified instruction to the effect that the defend-

ant was bound to retreat, if he could do so without subjecting himself to the risk of death or great bodily harm, was reversible error.

5. HOMICIDE—*Self Defense—Justifiable? When.* Where the deceased has sought out the prisoner with a deadly weapon for the purpose of taking his life, or where the prisoner is violently attacked in his own house or in a place where he has a right to be, or where he is assaulted with a deadly weapon; and he has not provoked the assault, or brought on the difficulty, he is not bound to retreat, but has a right to stand and defend himself, and if the necessity arises for taking the life of his adversary in order to save himself from great bodily injury, such killing is justifiable on the grounds of self-defense.

6. INSTRUCTIONS—*Application of Law to Pleading and Proof.* It is not every correct proposition of law that is proper to be submitted to a jury as an instruction on the trial of a cause. In charging the jury, due regard must be had to the state of the case, the character and amount of proof, and the law as stated to the jury must be applicable to the pleadings and testimony.

7. SAME—*Assumption of Controverted Questions—Evidence—Witness—Credibility.* The court has no right in charging the jury to submit any proposition which assumes any particular controverted fact to be proven, which is an expression upon the weight of the evidence or credit of a witness, or which requires the jury to give more credit to one class of testimony than some other. The jury must be left entirely free to determine all facts, the weight of the testimony, and the credit to be given the witnesses.

8. CONFESSION—*Competency of—Determined in Jury's Absence—Error.* Where the competency of confessions are objected to on the ground that they were not voluntary, or were made under duress or promises of leniency, the court should withdraw the jury and hear all the facts and circumstances attending such alleged confession and determine its competency in the absence of the jury. If it is held incompetent, the matter should go no further; but if held competent and proof of same admissible, then the jury should be recalled, and are entitled to all the facts and circumstances attending such confession; not for the purpose of passing on its competency, but in order to determine the weight and credit to be given such confessions. It is not prejudicial error to hear such evidence in the presence of the jury where, on such hearing, the confessions are found to be competent, and evidence of such confessions is admitted. It could only be prejudicial error to hear such evidence in the presence of the jury, where on such hearing the court should hold the confessions incompetent, and exclude the evidence of the confessions. And

even then it might not be prejudicial error. This question should be determined from a consideration of the entire record of the trial.

(Syllabus by the Court.)

*Error from the District Court of Canadian County; before John. L. McAtee, District Judge.*

*R. B. Forrest* and *F. B. Duke*, for plaintiff in error.

*W. H. Baker, County Attorney* and *Harper S. Cunningham, Attorney General*, for defendant in error.

Opinion of the court by

BURFORD, C. J.: The plaintiff in error, Taylor Kirk, was convicted of the crime of murder and sentenced to be hanged. The indictment was returned in the district court of Washita county, on October 17, 1899. The defendant was arraigned on October 18, and entered his plea of not guilty on the following day. On October 20, on the defendant's application, the venue of said cause was ordered changed to Canadian county, and such change was duly perfected.

The cause came on for trial in the district court of Canadian county on November 27, 1899, and the defendant applied for a continuance on account of the absence of certain witnesses. The application was overruled, and on the same day the defendant made application for a change from the Hon. C. F. Irwin, presiding judge. The change was allowed, and Associate Justice John L. McAtee was afterwards designated to preside on the trial of said cause.

On December 6, 1899, said cause came on for trial before Justice McAtee, presiding judge, and the defend-

ant renewed his application for a continuance, which was overruled, and exceptions saved. The defendant was then tried to a jury, and a verdict of guilty of murder was returned, and the punishment fixed at death. Motions for new trial and in arrest of judgment were filed and overruled, and the defendant was sentenced to be hanged on the 9th day of February, 1900.

From this judgment the defendant appeals to this court.

A number of errors are presented for review, and we will consider them in the order presented in the brief of counsel for defendant.

The first objection presented is that the trial court abused its discretion in denying the application for a continuance. The defendant was charged with shooting and killing his sister, at the home of his brother-in-law, in Washita county. In the affidavit for continuance, the defendant alleged that for some time prior to the killing of his sister, there had been a strong feeling on the part of the deceased against the defendant, and owing to her ill feeling and anger towards him, she had, previous to the day of the homicide, made attempts to take his life; that the deceased was possessed of a dangerous and revengeful disposition, and was accustomed to handling fire arms, and constantly kept a gun or revolver at her command; that several months prior to the homicide he was visiting his father in the Chickasaw Nation, where his sister resided, and while there she tried to procure his assassination, and attempted to procure a gun for the purpose of killing him, and that when defeated in these efforts, she made threats to kill him at some future time. It was further alleged that certain

witnesses residing in the Chickasaw Nation would testify to these facts, but that he was unable, by reason of his poverty, to procure their attendance; that a relative had promised to assist him with funds, which he had not received; but that if the case were continued he believed this relative would, as soon as he could procure the funds, assist him to procure the testimony of these witnesses. The affidavit further alleged that the homicide occurred at the home of his brother, Bedford Kirk, and in the presence of his brother and sister-in-law, Laura Kirk; that on the 4th of July, the day of the homicide, they were all arranging to go to a celebration, or picnic; that he and his deceased sister had some trouble and a quarrel; that he accused her of trying to procure others to get him into trouble and kill him. Following this, the affidavit contains this statement:

"And the deceased flew into a fit of rage, and started towards the head of the bed where this affiant's six-shooter was hanging, reaching for the same, but affiant rushed to the point where the six-shooter was hanging, and reached it down and kept the deceased from getting the said weapon, the deceased saying to the affiant: 'I will kill you myself:' that thereupon the deceased rushed to the foot of the bed under the cover of which there was a loaded Winchester rifle, and reached under the cover, and was drawing the Winchester out, at the time threatening to take the life of this affiant, saying. 'I will kill the cowardly s—— of a b——,' and was just about to raise said gun, when affiant, believing that he was about to be shot by the deceased, fired the shot which slew the deceased."

The affiant further stated that Bedford Kirk and Laura Kirk were each present and saw all that was done and heard all that was said; that they resided in Wash-

ita county, Oklahoma; that he had caused no subpoena to issue for them because their names were endorsed on the indictment as witnesses for the Territory, and that Laura Kirk had promised his counsel to be present and testify; that he did not know her whereabouts but believed her to be secreting herself to avoid the service of process; and if a continuance was had, that he believed her testimony could be obtained.

The affidavit contained other statements, but the foregoing embraces all that was material. This affidavit was supplemented by affidavits of defendant's attorneys, to the effect that they had been unable to obtain the necessary funds to procure the witnesses or their testimony, but that a relative of the defendant, residing in Texas, had promised to assist at some future time.

It is conceded by counsel for the defendant that the granting or refusing a continuance is largely within the discretion of the trial court; but it is insisted that the court abused this discretion in refusing a continuance in this case.

The record discloses that the crime with which defendant was charged was committed on July 4, 1899, and he was not put to his trial until about six months thereafter. The defendant was arrested upon this charge immediately after the commission of the offense, and then admitted that he killed the deceased. He then knew that he would be tried for the crime. If he had any reason to believe that Laura Kirk or Bedford Kirk would absent themselves from the Territory to avoid testifying at the trial, it was his duty to procure their depositions under the provisions of article 18, chapter 68, Statutes of Oklahoma, 1893. The same statute makes ample pro-

vision for taking depositions on behalf of the defendant of witnesses residing out of the Territory. No steps had been taken to procure depositions or the testimony of any of the persons mentioned in the affidavit. The application lacks the evidence of good faith, as well as that of diligence.

Section 73, article 8, chapter 68, Statutes 1893, makes the provisions of the civil code applicable to motions for continuance in criminal causes. Section 329 provides:

"A motion for a continuance on account of the absence of evidence can be made only upon affidavit, showing the materiality of the evidence expected to be obtained, and that due diligence has been used to obtain it, and where the evidence may be, and if it is for an absent witness, the affidavit must show where the witness resides, if his residence is known to the party, and the probability of procuring his testimony within a reasonable time; and what facts he believes the witness will prove, and that he believes them to be true."

The affidavit in question lacked two of the material requirements of this statute; there was a total lack of any showing of diligence to procure the attendance of any of these witnesses, and there was no reasonable showing of a probability of procuring their attendance in the future. The witnesses Bedford Kirk and Laura Kirk, the persons who witnessed the killing, had been witnesses before the grand jury; their names were on the indictment; that had furnished at least a portion of the evidence upon which the indictment was founded. It is hardly to be presumed that their testimony could be very favorable to the defendant. The Territory had issued subpoenas for them, and it was shown that the sheriff had made diligent search for them and could not

find them.    They were evidently seeking to avoid the unpleasant duty of testifying against a brother for taking the life of a sister.

The defendant contends that he was execused from making any effort to procure the attendance of the brother and sister-in-law, for the reason that he had a right to rely upon the fact that their names were on the indictment, and that the Territory was bound to produce them.    We do not regard this as a sufficient excuse for a failure to make an effort to secure their attendance in his own behalf.    The law requires that one who requests a continuance shall show by affidavit that he has used due diligence to procure the attendance of the absent witness; this is required of him as an evidence of his good faith.    It is not sufficient for him to show that the adverse party has used due diligence to obtain the absent witness and failed. If this were permitted, the party might in every case ascertain from the subpoenas issued by the adverse party the names of the witnes,es not found, and then make affidavit that such persons were necessary witnesses for him, and that he had issued no process because the adverse party had done so.    The party who causes a witness to be subpoenaed may excuse them before attendance, or discharge them before testifying.    He is under no obligation or duty to hold them for the adverse party.

And in the case at bar, the defendant was required, if he desired the testimony of Bedford Kirk or Laura Kirk on his trial, to cause subpoenas to issue for them, and take all the necessary steps to have such subpoenas served upon them.    And he had no right to rely upon the prosecution procuring them.    There was no attempt

at diligence in procuring the attendance of the resident witnesses, or the depositions of the non-residents. It is not sufficient to say that he had no means. He had counsel employed. It would have required no immediate expenditure of funds to have made the necessary affidavits, procured the required order to take depositions, and served the proper notices. A number of the witnesses were near relatives, and all preliminary steps could have been taken to insure good faith, and show diligence, even if the defendant were short of ready money.

Counsel cite us to the case of *Saylor v. Commonwealth*, 30 S. W. Rep. 390, where it was held by the Kentucky supreme court that where a witness has been recognized at the instance of the commonwealth to appear as a witness for the defendant at that term of court, it was not necessary for the accused to have a subpoena issued or served on such witness. We think there is no application of this case to the question here presented. Where a witness is recognized to appear at a term of court, neither party has any authority to excuse him from such attendance, and either party may rely upon the good faith of such action, and dispense with further effort to secure his attendance.

It cannot be reasonably contended that the conditions are the same where the adverse party controls the action of the witness, and may require his attendance or execuse him at his option. We think there was no abuse of discretion in overruling the application for a continuance.

The next objection urged upon our attention is the contention that the trial judge during the progress of the trial made certain statements and remarks which

were of a character to prejudice the minds of the jurors against the defendant. The record discloses that during the empaneling of the trial jury, one A. M. B. Custer was called as a juror, and on his *voir dire* was asked the question whether or not he entertained any conscientious scruples against capital punishment. To this question the juror answered, "Yes sir." The judge then addressed the juror as follows: "If it is a bad case, and the law and the evidence are strong, and the case is a bad one, and you thought beyond a reasonable doubt that the defendant had been guilty of cold-blooded and vicious murder, would you then be against it?" Answer,

"No sir." The next juror, D. F. Sheffer, was asked whether he entertained any conscientious scruples against inflicting the death penalty, and answered that he had; the court then propounded to the juror this question: "Do you think in a murder case of extreme circumstances, where the circumstances would show a case of extreme cruelty, where you would be shown that it was extreme cruelty, and the law was plain, would you then be in favor of capital punishment?" Answer, "I do not believe I could do that." By the court: "Suppose you came to town and left your wife at home and some outlaw went into the house and killed her, shot her down in cold blood, and you went home and found her; what would you think about capital punishment in that case?" Answer, " It is a pretty deep question; it is hard to answer." By the court: "I do not want you on the jury. You may stand aside." These questions by the court were objected to by the counsel for the defendant, the objections overruled, and exceptions saved. On examination of the juror A. E. Geoffrey, the following proceedings appear in the record:

"Question.    Have you any conscientious scruples against the infliction of the death penalty where the law and the facts warrant it?   Answer.   It would have to be **a** very strong case, sir.

"Q.   What do you mean by that?   A.   On general principles I am opposed to capital punishment,

"Q.   On some special cases you might inflict the death penalty?   A.   I suppose I might if they were strong enough,

"Q.   Then it is a fact that you have some conscientious scruples?   A.   Yes, sir.

"By counsel for prosecution:   'We challenge the juror for cause.'

"By the court:   'Have you any conscientious scruples against the death penalty in proper cases, if a very strong case were presented to you; if the case showed aggravated circumstances where a woman was murdered by a man in a very cruel manner, would you then be against the infliction of the death penalty; would you have conscientious scruples in that case?'

"To which the defendant objects.   Objection overruled and exception.

"Answer.   No, sir; not if it were strong enough and the law was clear.

"Q.   Then in that case you would have no conscientious scruples?   A.   No sir, I think not in such a case as that.

"Challenge overruled."

Were these proper questions to be propounded to the jurors?   The law recognizes no degrees in the conscientious convictions of persons against inflicting the death penalty; nor is the degree of cruelty exercised in perpetrating the homicide a material question.    Nor is it proper to appeal to the juror's feelings of revenge or vindictiveness in case of an outrage to one near or dear to

him, in order to determine the state of mind on the subject which would render him a competent juror. By the provisions of the Criminal Code, where the offense may be punishable with death, any juror who entertains such conscientious opinions as would preclude his finding the defendant guilty and assessing the death penalty, shall neither be permitted nor compelled to serve as a juror. (Section 5185, Statutes 1893.)

This rule is plain, definite and clear. If the juror entertains such conscientious opinions as would preclude him from fixing the death penalty, in the event he finds the accused guilty of murder, then he can neither be permitted nor compelled to serve. The court is allowed no discretion, and the character of the homicide should be no test for determining whether the juror does entertain such opinions. A juror, when acting under the solemnity of an oath, and in the grave and responsible position of determining the legal rights of one charged with murder, might consistently and conscientiously entertain opinions on the subject of inflicting the death penalty, which would preclude him from assessing the death penalty. Yet, under different circumstances, if he should discover a member of his family cruelly and wantonly murdered in cold blood, he would, in the heat of passion, or to avenge such a wrong, take the life of the slayer, and feel justified in doing so. The two positions are not incompatible.

The only test to determine the competency of the juror is that fixed by the statute, and this test must be the same whether the crime is an unusually aggravated or an ordinary homicide. The questions propounded to the jurors by the court might possibly have the effect to

create in the minds of the jurors the impression that, in the opinion of the court, the case to be presented to them was no ordinary one. But, on the contrary, it was one of extreme cruelty; one of rare occurrence; a cold-blooded and vicious murder; one where a man had cruelly shot down a woman in cold blood; one of aggravated circumstances, and if the juror were willing to inflict the death penalty in a case of that character, then he was a competent juror; otherwise, he was not wanted. And having received this impression from the course of the court's examination on their *voir dire*, as the evidence was introduced, and the facts were gradually disclosed to the jurors, they would become more firmly impressed with a conviction that the court's hypothetical questions were based upon the court's views of the case being presented to them. We cannot say that these impressions were actually made upon the minds of the jurors; but we deem it judicious to avoid submitting to the jurors on their *voir dire* any hypothetical question which might lead to the impression that it was one based upon the facts to be presented in the case. As to whether the questions complained of constitute such prejudicial error as will necessitate the granting of a new trial, we do not now express an opinion.

It is also insisted that the trial judge made prejudicial remarks in the presence of the jury regarding defendant's counsel, and also expresed his opinion as to the credibility of certain witnesses while they were testifying. In support of this contention we are referred to the following excerpts from the record. While George Auxier, a witness for the Territory, was being examined in reference to a conversation had with the defendant, counsel for

defendant on cross-examination submitted this question:

"Question. Can you tell the balance of the conversation? Answer. No, sir, not all of it.

"By counsel for defendant: 'We move to strike out this testimony of the witness.'

"Overruled. Exception.

"By the court: 'Of course you have a right to object, but you work it to death; you work it to death.'

"By counsel for defendant: 'If the court will allow me to explain myself on this matter—'

"By the court: 'I will not allow you at all; I do not want to hear from you.'

"To which the defendant excepts.

"By the court: 'The whole law is for the protection of the defendant, and you work it for the confusion of the court as well. I will not allow it.'

"To which remarks of the court the defendant excepts."

Again, while Mr. B. H. Baker, the county attorney of Washita county, was on the stand as a witness for the prosecution, and testifying in the presence of the jury as to whether certain confessions were voluntary, these proceedings occurred:

"Question: Had you at any time prior to this made any threat or offered any inducement to him? Answer. Not in the slightest.

"Q. Do you know of any other person having done so? A. Not a single one. If you will permit me I will make a statement; I took particular pains in instructing the officers not to make—(interrupted by defendant's counsel) 'I do not think it is proper for him to make such statements to the jury as that, your Honor. I object to it.'

"By the court: 'This is the county attorney of that county. It is not at all supposed that he would be sit-

ting here trying to get in evidence that is not proper. Go ahead.'

"To which the defendant excepts.

"Answer continued: 'I told all the officers not to offer any inducements or to make any threats to him in order to get him to make his confession, but to warn him that what he said might be against him.'

"The defendant objects to the statement of the witness as to what he told the other officers, and asks that it be stricken out. Overruled. Exception."

While Sheriff Morrison was testifying as a witness for the Territory, the following occurred:

"By counsel for defendant: 'Now did he say something about reaching for a gun?' A. Well, it seems there was a gun there, and he made a reach for it.

"By counsel for defendant: 'I do not care anything about what seems to you. Tell what he said.' A. He said he took a forty-five and killed her.

"By the court: 'Col. Forrest, your questions are not fair. These witnesses are not accustomed to the sharp and distinct meaning of words.'

"By counsel for the defendant: 'He is an experienced witness; he has been on the stand time and time again in criminal cases.'

"By the court: 'If he is the sheriff of Washita county, it would be almost imposible for him not to be in court. Do not go into a discussion with him about the use of ordinary terms. It is a very common phrase; it is one that is usually used by witnesses on the stand. I do not think it fair to the witness.'

"By counsel for defendant: 'All I want is for him to state what he said, and not what seemed to him.'

"By the court: 'Do not quarrel with witness.'

"By counsel for the defendant: 'I except to the remarks of the court in the presence of the jury.' "

This latter statement of the court was a direct reflection on the counsel for defendant, and an express disapproval of his conduct. It was an expression in the presence of the jury of a lack of confidence in his management of the examination of the witness. The expression of the court in reference to the witness Baker is one of confidence in the standing and integrity of the witness. It is equivalent to saying to the jury: "This witness is the county attorney. You cannot presume that he will state anything that is improper, or anything but the truth; his evidence is reliable." It is an expression as to the credibility of the witness.

These expressions of the court, taken in connection with the questions propounded by the court to the jurors, were of a character calculated to impress the jury, and might reasonably have prejudiced them against the defendant, his counsel and defense.

That able jurist and learned author, Judge Elliott, in his Appellate Procedure, sec. 671, says:

"Remarks made by the judge during the progress of the trial, if material and improper, may, when properly excepted to and brought into the record, constitute prejudicial and available errors, although they may not be instructions as to the law of the case. It is obvious that jurors may be influenced as effectively by the remarks of the judge during the progress of the trial as by formal instructions, and where such remarks are likely to exert prejudicial influences upon the jury, they may be made available for the reversal of the judgment."

Another eminent law writer, Mr. Thompson, in his work on Trials, says, sec. 218:

"Undoubtedly any remarks of the presiding judge made in the presence of the jury, which have a tendency to

prejudice their minds against the unsuccessful party, will afford ground for the reversal of the judgment."

The supreme court of Oregon, in *State v. Clements*, 14 Pac. 413, very appropriately said:

"If there is any one virtue in the judicial mind entitled to superior excellence, it is patience to hear and determine matters involving the rights and liberties of those charged with the commission of crime. It is the highest aim of the court to insure parties arraigned at the bar of justice a fair and impartial trial, and to avoid the least semblance indicating that the prosecution is maintained through a spirit of vindictiveness. The supreme court of the United States has ever sedulously guarded against any appearance of passion or impatience in its administration of the law. If such a course is best and wisest for an appellate court to pursue, how much more important it is that a *nisi prius* court should observe it. The latter is often convened to try cases of high sensational character in the vicinity of where they arise, and in which the tone and sentiment of the community are inflamed by excitement and prejudice. Hence, the least encouragement on the part of the presiding judge would pervert the affair from an investigation to ascertain truth into a scene of persecution."

In *McMinn v. Whelen*, 27 Cal. 300, the supreme court of California used the following language:

"From the high and authoritative position of a judge presiding at a trial before a jury, his influence with them is of vast extent, and he has the power, by words or action, or both, to materially prejudice the rights and interests of one or the other of the parties. By words or conduct he may on the one hand support the character or testimony of a witness and may on the other destroy the same in the estimation of the jury; and thus his personal and official influence is exerted to an unfair advantage to one of the parties, with a corresponding detriment to the cause of the other."

The supreme court of Florida, in *Garner v. State*, 9 So. Rep. 843, says:

"We are entirely satisfied that the remarks made by a judge in the trial of a cause, as to the credibility of a witness, or as to the weight of any evidence relevant to the issue, however inadvertently made—are an infringe- ment upon the province of a jury, and when duly ex- cepted to, are grounds for a reversal of judgment." '

In *People v. Hill*, 56 N. Y. S. 262, the appellate court of New York says:

"The courts have been prompt to condemn any action of the trial judge calculated to excite prejudice in the minds of the jury against any party or witness."

And in *People v. Brow*, 35 N. Y. S. 11, the same court says:

"A party to an action is entitled to a determination of the jury on the question of the credibility of witnesses uninfluenced by the opinion of the court."

In *Cronkhite v. Dickerson*, 51 Mich. 177, Mr. Justice Sherwood said:

"Jurors are very vigilant in scrutinizing all that is said by the trial judge in the progress of a cause before them, and great care should be observed that nothing is said which can, by any possibility, be construed to the prejudice of either party. Courts cannot be too circum- spect in this regard."

That eminent expounder of the law, Mr. Justice Cooley, in *Wheeler v. Wallace*, 53 Mich. 355, said:

"It is possible for a judge to deprive a party of a fair trial, even without intending to do so, by the manner in which he conducts the case, and by a plain exhibition to the jury of his own opinions in respect to the parties or to their case, and when it is apparent that a fair trial has not been had, a court of review should give relief as soon for that cause as for any other.

"It is nevertheless possible for a judge, however correct his motives, to be unconsciously so disturbed by circumstances that should not affect him, as to do and say, in the excitement of a trial, something, the effect of which he would not at the time realize, and thereby accomplish a mischief which was not designed."

In the case of *McDuff v. Detroit Evening Journal*, 47 N. W. 671, the supreme court of Michigan said:

"Whatever language may be used by counsel in the heat of trial, it is the legal duty of the judge to preside and decide with impartiality, and to keep counsel within proper bounds. Appellate courts must presume that one occupying so important a position as that of circuit judge can influence a jury. It is their duty to follow his instructions as to the law. Whenever he expresses an opinion on any disputed fact, or on the character of a witness, or compliments one attorney at the expense of the other, or uses language which tends to bring an attorney in contempt before a jury, or uses any language which tends to prejudice them, he commits an error of law for which the verdict and judgment must be promptly set aside."

In the case of *Young v. The Territory*, 8 Okla. 525, 58 Pac. 724, this court approved this doctrine and said:

"If, as is not infrequently the case, it becomes necessary for the court to admonish counsel, or to assess punishments against attorneys engaged in the trial of a cause, for improper language or behavior, it is better that such action be taken after the jury has withdrawn, especially in the trial of a criminal cause. The jury who, with scrutinizing eagerness, observe every ruling of the court, and watch his actions and weigh his words with scrupulous exactness, are liable to take the criticisms of counsel by a trial judge as an indication of his opinions or views of the cause, or by becoming prejudiced against counsel, let such prejudice affect the party he represents."

In the case of *Wilson v. The Territory*, 9 Okla. 331, 60 Pac. 112, the law as enunciated in the cases herein cited was approved, and in that case it was specifically held, that: "On a trial for murder, remarks made by the judge during the progress of the trial affecting the character and credibility of a witness, are an improper invasion or infringement of the province of the jury, and when it appears that such remarks were prejudicial to the rights of the defendant, they constitute reversible error."

This last case is applicable here; the remark of the court in reference to the testimony of the witness Baker was an expression affecting the credibility of the witness, and invaded the province of the jury, who had a right to weigh his testimony unaffected by any views of the court.

The defendant has been convicted of a most horrible crime, and adjudged to suffer the highest penalty known to the law. If it is clear that he has been convicted in due form of law, and that he has had a fair and impartial trial; that the verdict of the jury was uninfluenced by any improper remarks or conduct of the court or counsel, then the judgment should be allowed to stand, and the punishment be inflicted as directed, for in such case it is none too severe. On the other hand, the consequences are of such grave and sacred import, and the responsibility of such high character and concern, that if it appears that any unauthorized proceedings were permitted to occur on the trial, and there is a reasonable probability that such proceedings may have contributed to the result, then a court of review should correct the evils by granting a new trial.

It is next contended that the court erred in refusing the following request to charge the jury.

"No. 9. The court instructs the jury, that although parol proof of the verbal admissions of the defendant, while it appears that the admissions were understandingly and deliberately made, may sometimes afford satisfactory evidence, yet, as a general rule, the statements of a witness as to the verbal admissions of the defendant should be received by the jury with great caution, as that kind of evidence is subject to great imperfections and liable to mistakes. The defendant may not have clearly expressed his meaning, or the witness may have misunderstood him; it frequently happens that a witness, by unintentionally altering a few of the expressions he used, gives an effect to the statement completely at variance with what the defendant did say. If it appears to the jury, from the circumstances proved, that the defendant did not clearly express his own meaning, or that the witness may have misunderstood him, or that the witness had no reason or motive for remembering the exact language used, then but little reliance should be placed upon this class of testimony. Refused. Exception. McAtee, J."

It may be stated generally that the foregoing request embraces correct principles of law, but it does not follow that it constitutes a proper instruction to the jury.

It is not every abstract principle of law, though correctly stated, that is proper to give to a jury in an instruction. Due regard must be had for the state of the case, the character of the testimony, and the facts and circumstances appearing in evidence. The jury being the sole judges of the weight of the evidence and the credibility of the witnesses, the court must refrain from any statement which will amount to an expression of opinion or statement of law as to the weight or value of any particular class of evidence, the weight or value

of which is within the province of the jury to determine. The instruction requested is open to the objection that it invades the province of the jury, and states what is satisfactory evidence and what is not; and then directs them that if they find certain facts to be proved, to place but little reliance upon such class of testimony. The propositions of law contained in this request might have been properly embodied in an instruction by directing the jury that if they found from the evidence that if the defendant had failed to clearly express his meaning, or that the witness might have misunderstood him, or if his memory was defective, or if by the use of different language or altering a few of the expressions a different effect might be given to what the defendant did say, or that the witness had no reason or motive for remembering the exact language used by the defendant, then such facts should be considered by the jury in determining the weight of such testimony and the reliance they should put upon it.

We think there was no error in refusing this request. The law as stated in this request is taken from Greenleaf on Evidence, secs. 200 and 214, and embraces the rules laid down for the guidance of the court in receiving evidence of admissions and confessions, and is not in proper form to be submitted to a jury for their consideration.

It is contended that the court improperly instructed the jury on the law of self-defense. The defendant's only defense was the plea of self-defense. No witness to the homicide was present and testified except the defendant. He admitted the killing, and the only evidence against him consisted of his own testimony and the evidence of his confessions made immediately after the homi-

cide, together with proof of his testimony at the coroner's inquest. He was convicted upon his own confessions, corroborated by his testimony on the trial. He claimed he acted in self-defense; he testified that there had long been an ill feeling existing between him and the deceased; that they were both at the home of his brother, and had been staying there for some time; it was his temporary home, and she was there on a visit; that she had become highly incensed at him a few weeks before at their father's home in the Chickasaw country, and that she had threatened to kill him and had attempted to get a gun for the purpose of executing her threat; that she had written letters to a couple of friends in Texas, who were desperate characters, requesting them to seek an opportunity to take the life of the defendant; that she was an expert and skillful shot with rifle or revolver, and always traveled with a gun and revolver in her buggy; that she brought a large dirk knife and Winchester rifle with her to her brother's when she came on the last visit, and that she had followed him to his brother's for the purpose of seeking an opportunity to take his life; that she was hostile to him because he had found fault with the character of company she kept, and that she was of a vicious and dangerous disposition. He further claimed that on the morning of the homicide she became enraged at him, and declared that she would kill him; that she then seized a six-shooter in the room where they were, and attempted to take his life with it; that he grasped the six-shooter, and wrenched it from her; that then she took the loaded Winchester from under the bed clothes on the bed where it was kept, and was in the act of drawing this on him, when he fired the fatal shot. He swore that he believed she intended

to take his life with the Winchester, and that he believed it necessary to fire the shot to prevent her from killing him. This evidence was not contradicted, except in so far as it might have been at variance with some of the circumstances, or some of his former statements. The testimony of the defendant embraces the elements of self-defense. It was competent to go to the jury, and it was for the jury to determine what, if any, credit they would give it. It is the duty of the court to instruct on the evidence as presented. It is not for the court, in ruling upon evidence or framing instructions, to determine the probative force of evidence. If the evidence is material, relevant and competent, it is for the jury, and instructions bearing upon the evidence without respect to its weight or credibility cannot be deemed irrelevant.

The defendant requested the court to give request No. 3, as follows:

"The jury are instructed, as a matter of law, that if a person believes, and has reasonable cause to believe, that another has sought him out for the purpose of killing him, or of doing him great bodily harm, and that he is prepared therefor with deadly weapons, and the latter makes demonstrations manifesting an intention to commence an attack, then the person so threatened is not required to retreat, but he has a right to stand and defend himself, and pursue his adversary until he has secured himself from danger; and if, in so doing, it is necessary, or it appears upon reasonable grounds to be necessary, to kill his antagonist, the killing is excusable upon the grounds of self-defense."

This request was refused and excepted to. Under the evidence of the defendant this instruction was proper and should have been given. There was no question but that the defendant was at a place where he had a right to be;

he was at the place of his residence. As to whether he provoked the assault made by the deceased, was a question for the jury. The court could neither assume that he did, or did not, and if the jury believed the evidence of the defendant, then they might reasonably find that the deceased was following him up to the place of the homicide, armed with a dirk knife and Winchester, for the purpose of carrying out her previous threats.

On this subject the court instructed as follows:

"You are instructed that if you believe from the evidence that the deceased was making an effort to draw a Winchester rifle upon the defendant at the time he fired the fatal shot, then, as a matter of law, it was not necessary for the defendant to wait until she had drawn the weapon fully from the scabbard before firing the fatal shot, if you believe from the evidence that the defendant was in danger of being shot by the deceased, or that the circumstances were such that the defendant might reasonably believe that his life was in danger, and fired the fatal shot under the impression that it was necessary to take the life of the deceased in order to save his own life.

"But it was the duty of the defendant to retreat, and to avoid the taking of human life if he could do so without subjecting himself thereby to the risk of death or great bodily harm at the hands of the deceased."

The latter portion of this instruction relating to the duty of the defendant to retreat is clearly erroneous. It states a proposition of law applicable to a certain class of cases. But was this one of such class? This was a question for the jury to determine as a question of fact upon the whole testimony. The court had no right to assume, under the evidence in the case, that the defendant was the aggressor; that he had provoked the assault, or that he was in a place where he had no right

to be when the altercation arose. If the deceased made an attack on the defendant with a deadly weapon at a time when he was in a place where he had a right to be, and engaged in a lawful pursuit; if he did not provoke the assault, and the deceased manifested a purpose to take his life, and there was an apparent necessity for taking her life in order to save his own, then the defendant was not required to retreat. The court could not assume a state of facts to be proven which would authorize the instruction given. The facts should have been submitted to the jury, and the jury instructed that if they found certain facts to exist, then the defendant was bound to retreat.

The law of self-defense, and of the duty to retreat, was discussed and settled by the supreme court of the United States in the case of *Beard v. United States*, 158 U. S. 550, and we approve of the rules there enunciated. Mr. Justice Harlan, speaking for the court, said:

"But the court below committed an error of a more serious character when it told the jury, as in effect it did by different forms of expression, that if the accused could have saved his life and avoided taking the life of Will Jones by retreating from and getting out of the way of the latter as he advanced upon him, the law made it his duty to do so; and if he did not, when it was in his power to do so without putting his own life or body in imminent peril, he was guilty of manslaughter. The court seemed to think if the deceased had advanced upon the accused while the later was in his dwelling house, and under such circumstances as indicated the intention of the former to take life or inflict great bodily injury, and if, without retreating, the accused had taken the life of his assailant, having at the time reasonable grounds to believe, and in good faith believing, that his own life would be taken or great bodily harm done him

unless he killed the accused, the case would have been one of justifiable homicide. To that proposition we give our entire assent. But we cannot agree that the accused was under any greater obligation, when on his own premises, near his dwelling house, to retreat or run away from his assailant, than he would have been if attacked in his own dwelling house. The accused being where he had a right to be, on his own premises, constituting a part of his residence and home, at the time the deceased approached him in a threatening manner, and not having by language or by conduct provoked the deceased to assault him, the question for the jury was, whether, without fleeing from his adversary, he had, at the moment he struck the deceased, reasonable grounds to believe, and in good faith believed, that he could not save his life or protect himself from great bodily harm except by doing what he did, namely, strike the deceased with his gun, and thus prevent his further advance upon him. Even if the jury had been prepared to answer this question in the affirmative—and if it had been so answered the defendant should have been acquitted—they were instructed that the accused could not properly be acquited on the ground of self-defense if they believed that, by retreating from his adversary, by 'getting out of the way,' he could have avoided taking life. We cannot give our assent to this doctrine.

"The application of the doctrine of 'retreating to the wall' was carefully examined by the supreme court of Ohio in *Erwin v. State*, 29 Ohio St. 186, 193, 199. That was an indictment for murder, the defendant being found guilty. The trial court charged the jury that if the defendant was in the lawful pursuit of his business at the time the fatal shot was fired, and was attacked by the deceased under circumstances denoting an intention to take life or to do great bodily harm, he could lawfully kill his assailant provided he used all means 'in his power' otherwise to save his own life, or prevent the intended harm, 'such as retreating as far as he can, or disabling

his adversary, without killing him, if it be in his power;' that if the attack was so sudden, fierce, and violent that a retreat would not diminish but increase the defendant's danger, he might kill his adversary without retreating; and further, that if from the character of the attack there was reasonable ground for defendant to believe, and he did honestly believe, that his life was about to be taken, or he was to suffer great bodily harm, and that he believed honestly that he would be in equal danger by retreating, then, if he took the life of the assailant, he was excused. Of this charge the accused complained.

"Upon a full review of the authorities and looking to the principles of the common law, as expounded by writers and courts of high authority, the supreme court of Ohio held that the charge was erroneous, saying: 'It is true that all authorities agree that the taking of life in defence of one's person cannot be either justified or excused, except on the ground of necessity; and that such necessity must be imminent at the time; and they also agree that no man can avail himself of such necessity if he brings it upon himself. The question then is simply this: Does the law hold a man who is violently and feloniously assaulted responsible for having brought such necessity upon himself on the sole ground that he failed to fly from his assailant when he might safely have done so? The law, out of tenderness for human life and the frailties of human nature, will not permit the taking of it to repel a mere trespass, or even to save life where the assault is provoked; but a true man who is without fault is not obliged to fly from an assailant, who by violence or surprise maliciously seeks to take his life or do him enormous bodily harm. Now, under the charge below, notwithstanding the defendant may have been without fault, and so assaulted, with the necessity of taking life to save his own upon him; still the jury could not have acquitted if they found he had failed to do all in his power otherwise to save his own life, or prevent the intended harm, as retreating as far as he could,

etc.    In this case we think the law was not correctly stated.'

"In *Runyan v. State*, 57 Indiana, 80, 84, which was an indictment for murder, and where the instructions of the trial court involved the present question, the court said: 'A very brief examination of the American authorities makes it evident that the ancient doctrine, as to the duty of a person assailed to retreat as far as he can, before he is justified in repelling force by force, has been greatly modified in this country, and has with us a much narrower application than formerly.    Indeed, the tendency of the American mind seems to be very strongly against enforcement of any rule which requires a person to flee when assailed to avoid chastisement or even to save human life and that tendency is well illustrated by the recent decisions of our courts, bearing on the general subject of the right of self-defense.    The weight of modern authority    in our    judgment,    establishes the doctrine that, when a person, being without fault and in a place where he has a right to be, is violently assaulted, he may without retreating, repel force by force, and if, in the reasonable exercise of his right of self-defense, his assailant is killed, he is justifiable.    *
*    It seems to us that the real question in the case, when it was given to the jury, was, Was the defendant, under all the circumstances, justified in the use of a deadly weapon in repelling the assault of the deceased?    We mean by this.    Did the defendant have reason to believe and did he in fact believe, that what he did was necessary for the safety of his own life or to protect him from great bodily harm?    On that question the law is simple and easy of solution, as has been already seen from the authorities cited above.'

"In East's Pleas of the Crown, the author, considering what sort of an attack it was lawful and justifiable to resist, even by the death of the assailant, says:  'A man may repel force by force, in defence of his person

habitation or property, against one who manifestly in
tends or endeavors, by violence or surprise, to commit a
known felony, such as murder, rape, robbery, arson, bur
glary, and the like upon either. In these cases he is not
obliged to retreat, but may pursue his adversary until he
has secured himself from all danger; and if he kill him
in so doing it is called justifiable self-defence; as, on the
other hand, the killing by such felon of any person so
lawfully defending himself will be murder. But a bare
fear of any of those offenses, however well grounded,
as that another lies in wait to take away the party's life,
unaccompanied with any overt act indicative of any such
an intention, will not warrant in killing that other by
way of prevention. There must be an actual danger at
the time.' (P. 271.) So in Foster's Crown Cases: 'In
the case of justifiable self-defence, the injured party may
repel force with force in defence of his person, habita-
tion or property, against one who manifestly intendeth
and endeavoreth, with violence or surprise, to commit a
known felony upon either. In these cases he is not
obliged to retreat, but may pursue his adversary till he
findeth himself out of danger, and if, in a conflict between
them he happeneth to kill, such killing is justifiable. (C.
3 p. 273.)

"In Bishop's New Criminal Law, the author, after ob-
serving that cases of mere assault, and of mutual quarrel,
where the attacking party has not the purpose of murder
in his heart, are those to which is applied the doctrine
of the books, that one cannot justify the killing of
another, though apparently in self-defence, unless he re-
treat to the wall or other interposing obstacle before
resorting to this extreme right, says that 'where an at-
tack is made with murderous intent, the person attacked
is under no duty to fly; he may stand his ground, and if
need be, kill his adversary. And it is the same where
the attack is with a deadly weapon, for in this case the
person attacked may well assume that the other intends
murder, whether he does in fact or not.' (Vol. 1. sec.

850.)' The rule is thus expressed by Wharton: 'A man may repel force by force in the defence of his person, habitation or property, against any one or many who manifestly intend and endeavor by violence or surprise to commit a known felony on either. In such case he is not compelled to retreat, but may pursue his adversary until he finds himself out of danger, and if in the conflict between them he happen to kill him, such killing is justifiable. (2 Wharton on Crim. Law, sec. 1019, 7th rev. ed. Phila. 1874.) See also *Gallagher v. State*, 3 Minn. 270, 273; *Pond v. People*, 8 Mich. 150, 177; *State v. Dixon*, 75 N. C. 275, 295; *State v. Sherman*, 16 R. I. 631; *Felds v. State*, 32 N. E. Rep. 780; *Eversole v. Commonwealth*, 26 S. W. Rep. 816; *Haynes v. State*, 17 Georgia, 465, 483; *Long v. State*, 52 Mississippi, 23, 35; *Twedy v. State*, 5 Iowa, 433; *Baker v. Commonwealth*, 19 S. W. Rep. 975; *Tingle v. Commonwealth*, 11 S. W. 812; 3 Rice's Ev. sec. 360.

"In our opinion, the court below erred in holding that the accused, while on his premises, outside of his dwelling house, was under a legal duty to get out of the way, if he could, of his assailant, who, according to one view of the evidence, had threatened to kill the defendant, in execution of that purpose had armed himself with a deadly weapon, with that weapon concealed upon his person went to the defendant's premises, despite the warning of the latter to keep away, and by word and act indicated his purpose to attack the accused.The defendant was where he had the right to be, when the deceased advanced upon him in a threatening manner, and with a deadly weapon; and if the accused did not provoke the assault and had at the time reasonable grounds to believe and in good faith believed, that the deceased intended to take his life or do him great bodily harm, he was not obliged to retreat, nor to consider whether he could safely retreat, but was entitled to stand his ground and meet any attack made upon him with a deadly weapon, in such way and with such force as, under

all the circumstances, he at the moment, honestly believed, and had reasonable grounds to believe, was necessary to save his own life or to protect himself from great bodily injury."

It is next contended that the court erred in permitting the testimony taken to determine the competency of confessions to be given in the presence of the jury. It is a well settled rule of law, that the question of the competency of confessions is one for the court, and should be determined preliminary to allowing the confession to go to the jury. The authorities are not harmonious upon the practice. We think the correct practice, and the one sustained by sound reason and weight of authority, is that when testimony is offered to prove a confession, and objection is made to the competency of the evidence, the court should withdraw the jury and hear all the evidence offered on the objection, both for and against the competency, and decide the question in the absence of the jury. If the court holds the confessions are not proper to be shown, then no prejudice can result from such action. On the other hand, if the court holds the confessions admissible, then the jury should be recalled, and if the defendant desires, all the evidence relating to the competency of such confessions, the circumstances under which they were given, the condition of mind of the defendant, and all other facts affecting or tending to affect the weight or credit of such confessions, should be permitted to go to the jury.

In the case at bar no prejudicial error was committed by the trial court in hearing the evidence on the competency of the confessions in the presence of the jury. When the court decided that the confessions were competent to be sworn, any error of hearing the matter be-

fore the jury was cured. The jury had a right to this testimony, not for the purpose of passing on the competency of the confessions, but for the purpose of determining what weight or credit they would attach to them. Had the court, after hearing the testimony on the competency of the confessions, decided that they were not proper to be shown, then error might have been predicated upon the improper evidence before the jury.

We have examined the record in this case with unusual care, and scrutinized each question with careful deliberation, and we are unable to say that the defendant has had that fair and impartial trial which the law guarantees to him. For the reasons herein stated, the judgment of the district court is reversed at the costs of Washita county, and a new trial ordered. The cause is remanded to the district court of Canadian county, with directions to make an order directing the return of the prisoner to the county jail of Canadian county, and to set the cause down for trial.

McAtee, J., having presided in the court below, not sitting; Burwell, J., and Hainer, J., concurring; Irwin, J., dissenting.