# W. D. LYONS v. STATE.

No. A-10108.     June 4, 1943.
Rehearing Denied July 21, 1943.
Dissenting Opinion On Rehearing Aug. 18, 1943.
(138 P. 2d 142;     140 P. 2d 248.)

198

Stanley D. Belden, of Cushing, and Thurgood Marshall, of New York City, for plaintiff in error.

Mac Q. Williamson, Atty. Gen., Sam. H. Lattimore, Asst. Atty. Gen., and Norman Horton, Co. Atty., of Hugo, for defendant in error.

Morris L. Ernst and Benjamin Kaplan, both of New York City, for American Civil Liberties Union, amicus curiae.

BAREFOOT, J. Defendant, W. D. Lyons, was charged jointly with one Van Bizzell in the district court of Choctaw county, Okla., with the crime of murder, secured severance, was tried, convicted and sentenced to serve a term of life imprisonment in the State Penitentiary, and has appealed.

For a reversal of this case, the following errors are cited:

"I. The admission in evidence of the second confession obtained at McAlester was a denial of due process of law and equal protection of the laws as guaranteed by the United States Constitution and therefore reversible error.

"II. Statements made to Sheriff Duncan at McAlester likewise should not have been admitted in evidence.

"III. The refusal to grant the defendant's requested instruction No. 2 was reversible error."

Before proper consideration of these errors, it is necessary to give a brief statement of the facts upon which they are based.

The charge of murder against this defendant was the outgrowth of the killing of Elmer Rogers and his wife and minor son, Elvie Dean Rogers, age four years, in their country home near Fort Towson, in Choctaw county, Oklahoma, on the night of December 31, 1939. Both Mr. and Mrs. Rogers were shot to death with a shotgun, and Mrs. Rogers was mutilated with an axe. Coal oil was then

poured on the house and it was set on fire, burning the bodies of both, together with their young son who was asleep in the home, beyond recognition. Two other young sons of Mr. and Mrs. Rogers, James Glenn Rogers age eight, and Billy Don, a small baby, escaped from the house and were saved. The oldest son was a witness for the state at the trial of the defendant. The information charges defendant with the murder of Elmer Rogers.

The crime is one of the most revolting that has ever been perpetrated in this state. A man and his wife were killed, and with their minor child, their bodies were burned beyond recognition. The motive for the killing was robbery.

The defendant was arrested the evening of January 11, 1940, at his home in Hugo, Choctaw county. He was taken by officers to the county jail. He remained in jail for a period of 11 days and no charges were made against him until after that time.

On the night of January 22, 1940, or the following morning, a confession was taken from the defendant by the officers of Choctaw county. The facts surrounding the securing of this confession will be further discussed in this opinion. It will be denominated as confession No. 1.

After this confession had been secured, and in the afternoon of January 23, 1940, defendant was taken from the Choctaw county jail at Hugo, to Antlers, the county seat of Pushmataha county, by Floyd Brown, a deputy sheriff, and Special Officer Reasor Cain, and placed in the county jail of that county. Some time near 6 or 6:30 on the same afternoon, Deputy Sheriff Van Raulston and Roy Marshall, a barber at Antlers, took defendant to the State Penitentiary at McAlester for safekeeping. Mr. Raulston had

been severely injured in an automobile accident and was still physically weak, so Mr. Marshall went along to drive the car.

There is some conflict in the evidence as to the exact time they arrived at the penitentiary, but it was some time between 8 and 9:30 that night. Upon their arrival at the penitentiary, they met the warden, the Honorable Jess Dunn (now deceased), and a second written confession was taken from the defendant, the details of which will later be discussed, but which is now designated as confession No. 2.

After defendant had been in the penitentiary three or four days, and during the month of January, 1940, he made a statement to Cap Duncan, who was at that time a sergeant in the penitentiary, and who had, prior to that time, been sheriff of Choctaw county. Bert Crawford, a guard at the penitentiary who had once lived at Fort Towson and knew W. D. Lyons and the Rogers family, was present at the time this statement was made. It will be discussed later, and will be designated as confession No. 3.

Defendant was taken from the penitentiary at Mc-Alester to Hugo, Choctaw county, for a preliminary hearing on January 28, 1940. The exact date of the filing of the complaint is not revealed by the record.

Defendant's trial was begun on the 27th day of January, 1941, over one year after his arrest. After the jury was impaneled and sworn and a number of witnesses had been introduced by the state, the state presented as a witness the Hon. Jess Dunn, warden of the State Penitentiary, and, after certain preliminary questions were asked, offered in evidence what has been designated as confession No. 2, being the one made at the penitentiary on the night of January 23, 1940.

The trial court immediately excused the jury from the courtroom and proceeded to hear evidence as to the admissibility of this confession; the hearing being for the purpose of determining whether or not the confession was a voluntary one. At this hearing counsel for defendant presented evidence, including the testimony of the defendant. They had him testify fully as to the treatment he claimed he had received while in the custody of the officers at the jail in Hugo, Choctaw county, prior to the first confession, and also as to the treatment he claimed he had received after he had been taken to the penitentiary, and prior to the second confession. There was no attempt on the part of the state to introduce the first confession, other than was developed on cross-examination of the defendant, after counsel for defendant had gone into the question.

At the conclusion of the introduction of evidence by the defendant before the court, the state introduced evidence in rebuttal. This evidence as to the treatment of the defendant by the officers was in direct conflict with the testimony of the defendant, the officers testifying that he had not been mistreated, the defendant testifying that he had. The trial court, after hearing all the evidence in the absence of the jury, announced that he found that the second confession, taken by the warden of the penitentiary on the night of January 23, 1940, was a voluntary confession, and that it could be introduced in evidence. The court, in making this announcement, said that the first confession was involuntary and could not be introduced, although there was no attempt on the part of the state to introduce the same. Proper exceptions were taken by counsel for defendant, and the jury was recalled and the trial proceeded.

It may be stated that the state in its case in chief did not refer to the first confession before the jury, but coun-

sel for the defendant fully developed before the jury the facts of both the first and second confessions. This was by cross-examination of the witnesses for the state, and by the evidence of the defendant himself, and other witnesses. Introduction of this testimony on the part of the defendant was proper, and was evidently for two reasons. First, for the purpose of having the court instruct the jury and permit them to pass upon the question of whether or not the second confession was a voluntary confession. Second, for the purpose of permitting all of the evidence to be placed in the record with reference to the first confession so that it might be contended, as is here done, that the second confession was so connected with the first that the defendant at the time of making the second confession was under fear and made the same by reason of the conditions which existed at the time he made the first confession. We here state that the trial court gave the jury an instruction to which reference will here-after be made, in which he submitted to them the question as to whether or not the second confession was voluntarily made, and instructed them that if they found, as a matter of fact, after hearing all the testimony, that the second confession was not a voluntary statement, they should disregard the same and not consider it.

We consider the above a fair statement of the issues and proceedings of the trial up to the time of the trial of defendant before the jury. This brings us to a consideration of the first assignment of error in defendant's brief. It is considered under three heads:

"A. Confessions secured by threats and violence are not admissible in evidence at the trial of accused."

As a general proposition the above statement is correct. If the state had offered in evidence the first confession, we would not hesitate to reverse this case for that

reason. There was a direct conflict between the testimony of the defendant and witnesses for the state with reference to the treatment defendant received; but there is sufficient evidence in the record to corroborate his statement that the first confession would be considered as an involuntary one, under the law. And we here unhesitatingly condemn the methods used in obtaining this confession.

The defendant testified to having been beaten with a blackjack by a special investigator of the Governor, who was assisting the officers of Choctaw county in their effort to obtain a confession from him; that he was taken from the county jail to the office of the county attorney, and was kept in the room from 6:30 in the afternoon until near 4 o'clock the next morning, and that during this time he was tortured by being beaten and struck, and that at one time a pan of bones and teeth taken from the bodies of the people whom it was claimed he had murdered, was placed in his lap, and he was forced to feel them and hold them in his hands, while questions were propounded to him.

Many officers of the law were present during the time he was being questioned, including the sheriff and county attorney of Choctaw county. However, the inquiry had been turned over to a great extent to the investigator from the Governor's office, who claimed that he was an expert of many years experience in securing confessions from parties who were accused of committing crimes. All of the officers who were present denied the evidence of the defendant, and all testified that he was not struck, or injured in any manner, either while he was being taken to the jail or at the time he was being questioned. But they did all admit that the pan of human bones and teeth had been placed in his lap, and that he had been made to feel of them and hold them in his hand while being questioned

by the investigator from the Governor's office and the county attorney.

The defendant testified that his first confession was made about 4:30 in the morning. The officers testified it was made about 12:30 or 1:30 in the morning. Many of the deputies from the sheriff's office were not present at all times, but were in and out of the room at different times. The questions propounded to the defendant by the county attorney revealed that he was present, and that he knew defendant was being questioned; that he participated in the questioning, and that he asked defendant: "I was not in the office until 6:30, was I, when they beat you?", and, "Isn't it true that Vernon Cheetwood had a strap of leather, and was tapping you like that, because you refused to answer questions they put to you?"

After defendant made the first confession that he and his codefendant killed Mr. and Mrs. Rogers, and that they had applied coal oil to the walls and set fire to the house, after placing the bodies therein, he was returned to the jail and the next morning was taken to the scene of the crime. There, under his direction, the axe with which Mrs. Rogers had been stuck was found, and at a place close by the shotgun shells were found that had been fired in the gun he had. The defendant directed the officers to the places where the axe and shotgun shells were found.

Under the above statement we think the court was clearly correct in excluding the first confession as being involuntary. And in passing we cannot refrain from calling attention to the fact that it is the sworn duty of the duly elected county attorneys and sheriffs of the counties of this state to do everything in their power for the enforcement of the law in their respective communities, and especially in ferreting out crime and bringing to justice one who has committed such a crime as the record in this case re-

veals. At the same time, one charged with crime has certain rights guaranteed him by the Constitution of the United States, and of this state. No peace officer should violate these rights, or permit them to be violated, and it is just as much the duty of the officers to protect the rights of defendants as it is to ferret out crime. It is not the right or the duty of an officer to secure from one whom he has arrested and has in his custody, an involuntary confession by the use of force, threats, violence or promises of leniency.

The Supreme Court of the State of Iowa in the case of State v. Thomas, 193 Iowa, 1004, 188 N.W. 689, 695, has expressed in forceful language the views of many courts in this country, including our own court, when it says:

"Before leaving this feature of the case, we think it not improper to say that, while diligence and zeal in public prosecutors and officers of the law to ferret out crime and punish offenders are highly commendable qualities, there is in too many cases a regrettable tendency to exercise their authority without due regard to the rights which pertain to every citizen until he has forfeited them by conviction of crime. If a crime has been committed, an officer of the law may properly apprehend and restrain of his liberty any person charged therewith for whose arrest he holds a warrant, and even without a warrant he may arrest one who commits a public offense in his presence. And if a public offense has been in fact committed by some one, and the officer has reasonable ground for believing that any given person is guilty of it, he may properly arrest such person without warrant.

"An arrest being lawfully made, it becomes the duty of the officer to promptly produce his prisoner to the proper magistrate to be dealt with according to law. Code, tit. 25, cc. 10 and 11. But it is not within the province of the public prosecutor or sheriff or policeman or detective or of all together to assume the guilt of a person not under arrest and for whose apprehension they hold no writ

and restrain him of his liberty or subject him to the indignity of inquisitorial examination, and grill him by methods which pertain to that modern instrument of torture known as the 'sweat box.' The mere fact that those who assume such authority and engage in such practices are public officers does not exonerate them from the charge of violating the law of which they are sworn defenders or differentiate them in any legal sense from the mob. If the sheriff and county attorney in this case had reasonable ground to believe defendant was guilty of the crime charged, it was, as we have already indicated, within the scope of their duty and authority to arrest him and produce him before the magistrate, where an examination could be had in an orderly and lawful way, and the rights of the state, on the one hand, and of the accused, on the other, could be properly protected. Instead of this, they constituted themselves a tribunal unknown to the law and proceeded without warrant to subject the man to a secret examination, from which his friends and his counsel were carefully excluded. They assumed his guilt, and refused to credit his denials and his protestations of innocence, or to accept anything he might say in his own behalf until they had extorted from him the alleged confession. Such proceedings are without excuse or justification, and to tolerate them or to ignore them without rebuke is to bring reproach upon the law and convert the administration of justice into an engine for the perpetration of rank injustice.

"The trial court adopted the theory that the question whether the alleged confession was freely and voluntarily made was for the jury, and in its charge told the jury that, unless they found such confession had been freely and voluntarily made, it should be rejected and given no weight against the defendant. It is the contention of appellant that, while this statement of the legal effect of a confession is substantially correct, the court erred in submitting the question of its voluntary character to the jury. There is some confusion in the authorities upon this proposition, but it is settled in this state that, where the free and volun-

tary character of the statements relied upon as a confession is the subject of dispute or conflict in the evidence, the question may properly be submitted to the jury. State v. Storms, supra [113 Iowa 385, 391, 85 N.W. 610, 612, 86 Am. St. Rep. 380]; State v. Bennett, 143 Iowa 214, 121 N. W. 1021. If, however, it clearly appears from the record that the alleged confession was not freely and voluntarily made, or if the state, by its own evidence, negatives these essentials to its use in evidence, it is the duty of the court to sustain the objection and refuse its submission to the jury. State v. Chambers, 39 Iowa 179; State v. Jay, 116 Iowa, 264, 89 N.W. 1070."

See, also, note 79 A.L.R. 457, State v. Thavanot, 225 Mo. 545, 125 S.W. 473, 20 Ann. Cas. 1122.

The citizens of every community look to their duly elected officers for the enforcement of the law. The practice of permitting someone designated as an "investigator," from the Governor's office, or from any other department, to come in and take charge of an investigation and mistreat a prisoner who is being held by the sheriff of any county should not be tolerated. And the county attorney should not permit one who is in the custody of the law to be brought to his office and put through third degree methods by whipping or beating, or permitting such an act as placing a pan of bones in his lap, as was done in the instant case, in order to secure a confession, when he knows it is certain to be held as involuntarily given and not subject to admission in any court. There are very few instances when all the facts are taken together but will show one's guilt, if he is guilty, and it is not necessary that a confession be obtained in every case to the end that the guilty party may be properly brought to justice. The facts in the instant case clearly demonstrate this.

Under subdivision "B" of assignment of error one, it is contended:

"Where a confession is obtained by such methods as to make it involuntary, all subsequent confessions made while accused is under the operation of the same influence are likewise involuntary."

This statement could well be admitted as true as a strict proposition, but the question that confronts us is, Was the subsequent confession "made while the accused was under the same influence" as when the first confession was made?

This brings us to a discussion of the second confession and proposition "C" under the first assignment of error, which is:

"Where a confession is involuntarily made as the result of threats there is a presumption that all subsequent confessions are made under the same influence and therefore inadmissible."

Counsel for defendant quotes in his brief under this proposition the rule announced in Wharton on Criminal Evidence (11th Ed. 1935, § 601, p. 998) and it so clearly states the general rule which is supported by the many cases we have read we quote it, as follows:

"Where a confession has been obtained from the accused by improper inducement, any statement made by him under that influence is inadmissible, but the question arises as to whether a confession made subsequently to such inadmissible confession is itself admissible. This question, as in the case of any other confession, is one for the judge to decide, and each case must be determined on its own facts. The presumption prevails that the influence of the prior improper inducement continues and that the subsequent confession is a result of the same influence which renders the prior confession inadmissible, and the burden of proof rests upon the prosecution to establish the contrary. Such proof must clearly show, to admit such subsequent confession in evidence, that the

impression caused by the improper inducement had been removed before the subsequent confession was made. The determination of the extent of the influence persisting at the time the subsequent confession is made rests upon attending circumstances, and the inquiry is whether, considering the degree of intelligence of the prisoner, the nature and degree of influence and the time intervening between the confessions, it can be said objectively that the confessor was not compelled to confess by reason of the pressure or inducement which motivated him to confess on the prior occasion.

"If the court concludes from all the facts and attendant circumstances that the improper influence had ceased to operate or had been removed, the subsequent confession is admissible. It has also been held, generally, that the influence of the improper inducement is removed where the accused is properly cautioned before the subsequent confession. The warning, however, so given should be explicit, and it ought to be full enough to apprise the accused: (1) That anything he may say after such warning can be used against him; and (2) that his previous confession, made under improper inducement, cannot be used against him, for it has been well said that 'for want of this information, the accused might think that he could not make his case worse than he had already made it, and under this impression, might have signed the confession before the magistrate.' "

In 20 American Jurisprudence, beginning with section 480, on page 418, a full discussion with reference to the admissibility as evidence of "confessions," is given. For the sake of brevity we refrain from quoting at length. However, we give the following sections where the rule as applied to the facts here is so clearly stated:

Section 486. "In the event there are several confessions by the accused, each relating to the same subject matter, there is no objection to the admission of all of them in evidence, provided they are all voluntary. If there are several confessions some of which are voluntary, and some

of which are involuntary, the ones made voluntarily are admissible in evidence and the ones made involuntarily are inadmissible; the fact that they all relate to the same subject does not make them one confession. However, it is obvious that if a confession is obtained under such circumstances or by such methods as to make it involuntary, all subsequent confessions made under the same circumstances or under the operation of the same influence are involuntary and inadmissible."

Section 487. "If one confession is obtained by such methods as to make it involuntary, all subsequent confessions made while the accused is under the operation of the same influences are also involuntary. It is immaterial, in this connection, what length of time may have elapsed between the two confessions, if there has been no change in the circumstances or situation of the prisoner. Once a confession made under improper influences is obtained, the presumption arises that a subsequent confession of the same crime flows from the same influences, even though made to a different person than the one to whom the first was made. However, a confession otherwise voluntary is not affected by the fact that a previous one was obtained by improper influences if it is shown that these influences are not operating when the later confession is made. In other words, the presumption that a subsequent confession of the same crime flows from the same improper influences which induced a prior confession is not a conclusive one and may be overcome by proof that the influences present at the prior confession did not operate on the subsequent confession. The evidence to rebut the presumption that the subsequent confession, like the original confession, is involuntary must be presented by the prosecution and must be given at the time the subsequent confession is offered in evidence, provided the court is then cognizant that the accused has made a prior involuntary confession. The evidence to rebut the presumption must be clear and convincing, however. If the facts regarding the securing of an involuntary confession are not known to the court when the later confession is

admitted, the evidence must be presented whenever the court becomes cognizant of the former confession, in which event it is for the jury to decide whether the subsequent confession was the result of influence which made the prior one involuntary."

Sec. 500. "Spontaneity is not necessary to the voluntariness of a confession, and in this country it is universally recognized that a confession is not rendered inadmissible in evidence merely because it was elicited by inquiries and questions addressed to the accused. This rule applies whether the questioning is done by a magistrate, prosecuting attorney, police officer or private person. In England there seems to be some question whether the mere fact of the interrogation of a prisoner by a police officer will per se render the confession inadmissible because of the inducement resulting from the very nature of the authority exercised by the police officer, assimilating him in this regard to a committing or examining magistrate.

"All courts concede that where a confession is elicited by the questions of a policeman, the fact of its having been so obtained is conceded to be one of the circumstances which is to be taken into account in determining whether the answers of the prisoner were voluntary. In the absence of anything to indicate that the confession was induced by duress, intimidation, or other improper influences, such confession is to be deemed voluntary and admissible, but the questions may be of such character and propounded under such circumstances and in such a manner as to render the confession inadmissible on the ground of coercion.

"The fact that the confession was made in response to a question assuming the guilt of the accused is not of itself sufficient to exclude it, unless the question was so framed as to trap the accused and inspire hope or fear or was accompanied by menacing circumstances."

Sec. 501. "The mere fact that a confession is made after a prolonged examination of the accused by police officers does not necessarily render the confession inadmis-

sible as evidence against the accused on the theory that it is an involuntary confession. A confession secured in such a manner has been deemed admissible, in the absence of anything to show that actual compulsion was exercised to obtain the confession. However, the length of the time during which an accused was questioned and the circumstances surrounding the questioning must be taken into consideration. In many instances, confessions made after prolonged examination by police officers have been held inadmissible in view of the facts and circumstances of the particular case."

Sec. 505. "The question whether a confession, to be voluntary, must have been preceded by a caution or warning as to the accused's right to remain silent depends to a large extent upon whether the confession is a judicial or an extrajudicial one. Apart from statute, the prevailing rule is to the effect that extrajudicial confessions are not rendered inadmissible or involuntary by reason of the failure to caution the accused that he need not talk and that, if he does, what he says will be used against him, even though such confessions are made under oath. According to the generally accepted view, the question whether a person has been duly cautioned before making a statement is a circumstance to be taken into account by the judge in exercising his discretion whether to exclude the statement, but the absence of a caution does not, as a matter of law, make the statement inadmissible. In other words, while a warning may not be decisive or important, it is nevertheless a material circumstance which shows that the confession was voluntary." See, also, page 442, sections 515, 516 and 518.

The main cases relied upon to support the contention of defendants are: Brown v. Mississippi, 297 U.S. 278, 56 S. Ct. 461, 80 L. Ed. 682; Chambers v. Florida, 309 U.S. 227, 60 S. Ct. 472, 84 L. Ed. 716; Canty v. Alabama, 309 U.S. 629, 60 S. Ct. 612, 94 L. Ed. 988; Vernon v. Alabama, 313 U.S. 540. 61 S. Ct. 833, 85 L. Ed. 1509;

White v. Texas, 310 U.S. 530, 60 S. Ct. 1032, 84 L. Ed. 1342.

These cases involve appeals from the Supreme Courts of Mississippi, Florida, Alabama, and the Court of Criminal Appeals of the state of Texas. In each instance the decision of the lower court was reversed by the Supreme Court of the United States. We have carefully read and examined the opinions of the Supreme Courts of the different states: Brown v. State of Mississippi, 173 Miss. 542, 563, 158 So. 339, 161 So. 465; Chambers v. State, 136 Fla. 568, 187 So. 156; Canty v. State of Alabama, 238 Ala. 384, 191 So. 260; Vernon v. State of Alabama, 240 Ala. 577, 200 So. 560; Id., 239 Ala. 593, 196 So. 96; White v. State, 135 Tex. Cr. R. 210, 117 S.W. 2d 450; Id., 139 Tex. Cr. R. 660, 128 S.W. 2d 51; and of the United States Supreme Court, and the other authorities presented in the briefs.

It has always been the practice of this court to follow the decisions of the Supreme Court of the United States, and especially is this true in cases involving the construction or application of the Constitution of the United States. Our high regard for the decisions of that court, their eminent fairness and legal learning justifies its recognition as the highest court in the land. If we were dealing with the first confession in the instant case, as heretofore stated, we would unhesitatingly apply the rule as announced in the Chambers Case, and immediately reverse this case. But as we read the record here, there is a clear distinction in the facts in the case at bar and the facts in each of the cases above cited.

In those cases, defendants were in each instance given the death penalty. In the instant case a sentence of life imprisonment was imposed. In those cases only one con-

fession had been made, and was relied upon. Here the second confession which was introduced in evidence was made at a time far removed from the first confession, and at a place where the defendant knew that he was secure from violence. He was acquainted with the warden of the penitentiary. He had been confined there on two previous occasions. Upon being asked by the warden if he desired to make a statement, he stated that he did. According to the evidence of the warden, and others, he was advised of his constitutional rights, and that any statement he made could be used against him, and that it was unnecessary to make any statement unless he desired to do so. The answers which he gave to the questions asked were such as only one who had actually committed the offense could possibly have given. His evidence as to his treatment after arriving at the penitentiary is so palpably false, that it could not be expected that the jury would believe it in passing upon the question of whether the statement was voluntarily or involuntarily made. A reading of the confession, and cross-examination of defendant in which he states that the party who was questioning him and those present forced him to answer the questions as he did, and his repeated denial that he answered the questions as they were written, cannot but convince any fair-minded person that the defendant was not telling the truth upon the witness stand. The statements which he did make cannot but satisfy one that only a person who had committed the crime could have given the details thereof as he gave them. His description of his actions and those of his codefendant; the action of the deceased and his wife; his manner of shooting deceased through the window, and the shooting of his wife as she ran in the yard; the placing of her body in the house after the striking of her with the axe; the applying of the coal oil to the walls, and the setting

fire to the house, all of which coincide with the physical facts, could only have been related in the manner it was by one who was present and committed the act. The answers which he gave could not have been suggested by the one propounding the questions, or any of those present. The very answers themselves fully demonstrate that they were being given freely and voluntarily without fear or influence. There was no reason for him to believe that harm would come to him if he did not make a statement, and his voluntary confession to the warden of the penitentiary, whom he knew, when asked if he desired to make a statement and he said he did, is conclusive that he was voluntarily making the same, and that he was not in fear of punishment if he did not make the same.

The confession made at the penitentiary, designated as confession No. 2 and which was admitted in evidence, is as follows:

"I, W. D. Lyons, a negro, at 8:15 o'clock p.m., on this 23rd day of January, 1940, in the office of Warden J. F. Dunn at the Oklahoma State Penitentiary at Mc-Alester, in the presence of J. F. Dunn, Warden of the Oklahoma State Penitentiary, Mr. Van Raulston, Deputy Sheriff of Choctaw County, Oklahoma, Mr. Roy Marshall, a citizen of Choctaw County, Oklahoma, and a stenographer, do of my own free will and accord, without threat of punishment, duress, fraud, coercion, promise of leniency or of any consideration whatsoever, or reward, do hereby and hereon make the following statement and confession, which statement and confession I swear to be the whole truth, without reservation: Interrogatories by Mr. J. F. Dunn: Q. State your name. A. W. D. Lyons. Q. Where do you live? A. Hugo, Oklahoma. Q. How long have you lived down there? A. I have lived down there mostly at Fort Towson. Q. How long have you lived around Fort Towson? A. All my life. Q. Were you ever convicted of any crime and sent to the peniten-

tiary? (Question objected to, objection sustained and the jury admonished not to consider any reference in that statement to previous servitude in the penitentiary.) Q. What have you been doing? A. Working most of the time. Q. Did you know a white man that lived around Sawyer, Oklahoma, by the name of Elmer Rogers? A. I never knew his name was Rogers. Q. Did you know where he lived? A. Yes, I knew where the house was. Q. Did you know he was the man that you talked to Vanzell about? A. No, sir. Q. You had been by his house? A. I had been by his house. Q. How many times? A. I went back and forth by his house several times. Q. Where does Vanzell live? A. Right out of Fort Towson. Q. Did you see Vanzell on Saturday or Sunday evening before New Years? A. Yes, I saw him at Fort Towson. Q. Did you talk to him? A. Yes, sir. Q. What did you say to him? A. I walked up to him and spoke. Q. What was the conversation? A. He asked me if I had a gun and I told him no. Q. Then what else was said? A. He told me if I had a gun that he knew where we could make some money. Q. Then what did you say? A. I told him I could get one. Q. What else was said? A. He told me to get it and meet him. Q. To meet him where? A. To start up the branch from Fort Towson. Q. You knew who you were going to rob—that you were going to rob a man by the name of Rogers, a white man that Saturday evening? A. Yes, sir. Q. He is the man that you and Vanzell agreed to rob on Sunday evening, New Years Eve night? A. Yes, sir. Q. Where did Vanzell tell you to meet him? A. Straight up the road on the branch from Fort Towson. Q. What time did you agree to meet him? A. About dusk—on Sunday evening, December 31, 1939. Q. Where did you go then? A. Stayed around Fort Towson. Q. What time did you leave there Saturday? A. I stayed there all night. Q. Did you get the gun then? A. No. Q. When did you get it? A. Sunday morning. Q. Did you pass the house that morning to look the situation over? A. No. Q. When did you pass? A. I don't remember. Q. Where did you go after you borrowed the gun? A. Over to Bus Fleaks' house. Q. Did you leave the gun

there? A. Yes. Q. What time did you go back and get it? A. About 3:30 o'clock in the afternoon. Q. Where did you carry it to? A. Went over to the cafe and then back in the edge of the woods. Q. Did you meet this other boy like you agreed to meet him? A. Yes, sir. Q. Was he there? A. I beat him there. Q. How long did you wait on him? A. About 20 minutes. Q. Did you go right direct from there to this house? A. Yes, sir. Q. You both walked up there? A. Yes, sir. Q. Where did you go when you got there? A. To the east window. Q. Was there a light in the house? A. Yes, sir. Q. Did you look in at the window? A. Yes, sir. Q. You and this other boy, Vanzell, together? A. Yes, sir. Q. Who did you see in there? A. His wife. When we first looked in there we didn't see him but we saw his wife and little baby. Q. How long did you stand at the window? A. About 20 minutes, I guess. Q. Did you ever peck on the window to draw attention or anything? A. No, sir. Q. How long did she stay so you could see her? A. She was sitting on the floor by the heater on the other side of him. Q. Where was he? A. He was sitting beside the wall on the floor and we couldn't see him. Q. Did you see the boy? A. Yes, sir. Q. Did you see her take the baby and put it to bed? A. No, sir, I didn't see her put it in the bed. Q. Where did you go to? A. No place. Q. Where did she go with the baby? A. She gave the little baby to him and made up the bed. Q Then what happened? A. Then he got up to go to bed. Q. Did you see her put the little baby in the bed? A. I didn't see her put him in bed. Q. Did you see her take the little baby out of his arms? A. Yes, sir. Q. And he got up and pulled off his clothes? A. Yes, sir. Q. Did you see him then? A. Yes, sir. Q. What did you do? A. I shot him then as he pulled his clothes off. When he got up from the side of the wall to pull his clothes off, I shot him. Q. Was the bed close to the window? A. No, sir. Q. Had the lights been blown out? A. No, sir. Q. Did he get his pants off? A. Yes, sir. Q. Then you shot him? A. Yes, sir. Q. Where was the other negro, Vanzell? A. He was standing in front. Q. What kind of a gun did you have?

A. 12 gauge shot gun. Q. What kind of shells? A. No. 4. Q. He was over close to the bed when you shot him? A. He was over close to the window. Q. How far was he from the window when you fired the shot? A. He was about three feet from the window. Q. How close did you have the barrel of the gun to the window when you fired? A. About two feet from the window. Q. You were standing on the outside on the ground? A. Yes, sir. Q. How was he standing? A. Standing sideways to me. Q. Do you remember what side you shot him in? A. In the left side. Q. How high up did you shoot him? A. About in the side. Q. You aimed to shoot him in the heart? A. No. Q. You just shot him in the left side? A. Yes, sir. Q. Did he fall? A. Yes, he fell. Q. Into the floor? A. Yes, sir. Q. Then what did you and this other negro, Vanzell, do? A. Waited until the woman came out. Q. Waited until the woman came out? A. Yes, waited until the woman came out. Q. Did you stand right there? A. Yes. Q. Did you hear the woman hollering in the house? A. She didn't holler. Q. She came out hollering for help? A. The little boy and the baby hollered. Q. What did she say? A. She didn't holler. Q. When she came out, did you see her as she came out the door? A. Yes, she came out the door. Q. Then what? A. She came out of the house and came around the house to the back. Q. Did you go, both of you go, to meet her? A. Yes, sir. Q. Were you facing her when you shot her? A. Yes, sir. Q. Did she see you before you shot when she came out? A. Yes, sir. Q. What did she do? A. She started to run. Q. Was she running when she came around the house? A. Yes. Q. Was you running around? A. I walked around—I didn't have far to go. Q. Were you at the corner of the house? A. Yes, sir. Q. She didn't have a chance to see you? A. Yes, she was by the house, there. Q. Did she turn around? A. No, she stood there. Q. Where did you shoot her? A. In the stomach. Q. Her facing you? A. Yes, sir. Q. How far was she from you? A. About 12 feet. Q. She fell? A. Yes, sir. Q. Did you have any more shells? A. Yes, sir. Q. How many? A. Five shells. Q. Did you reload your gun again? A. Yes, I did. Q. Was it a

pump or automatic? A. A single barrel. Q. You stopped there and loaded your gun again? A. Yes, sir. Q. She fell? A. Yes, sir. Q. What did she say when she fell? A. She hollered and fell. Q. What was she saying when you got the axe? A. She was sniffling and crying. Q. Did you or the other boy, Vanzell, hit her with the axe? A. He, Vanzell hit her. Q. Where did you get it? A. Out at the wood pile. Q. Where did you get that axe? A. He (Vanzell) had it before she came back around there. Q. Where was the wood pile? A. It was northeast of the house. Q. Are you right sure that he used the axe? A. Yes, sir. Q. How many times did he hit her? A. Three times. Q. Did you see it? A. Yes, sir. Q. You were standing right there? A. Yes, sir. Q. Did one or both of you put her on the porch? A. We both dragged her up—one on each side of her—ahold of her arms and sides. Q. You got one arm and he the other? A. Yes, sir. Q. How close to the porch did you put her? A. About middle way on the porch—close like to the house. Q. Was she dead then? A. Yes, sir. Q. What did you then do? A. Went in the house. Q. From the front or back? A. Front. Q. What did you then do? A. Searched his clothes. Q. Where was he? A. Laying on the floor. Q. Did you see anyone else in the house? A. No, I didn't. Q. How long were you in the house searching? A. About five minutes. Q. How much money was he supposed to have? A. The other fellow told me about a $100. Q. Did he tell you where he got the money? A. Been gambling out there somewhere. Q. Then after you searched his clothes where else did you search? A. In the dresser. Q. Where else? A. That's all. Q. Then what happened? A. We set the house on fire then. Q. How did you set it on fire? A. Put coal oil on it. Q. Which one picked up the lamp? A. He picked it up and blowed the light out. Q. You still had the gun in your hand? A. Yes, sir. Q. You still had your gun when he picked the axe up? A. Yes. Q. You reloaded the gun so that if anyone else should come out you would have killed them too? A. Yes, sir. Q. After you poured the coal oil on the floor, what happened? A. Poured it on the paper on

222

the side of the wall. Q. How many matches did you strike? A. One match. Q. How many did he strike? A. He struck three or four. Q. How many matches did you strike? A. I struck three or four but only one match set it. Q. How many places did you set the house on fire? A. I set it on the kitchen with those other matches. Q. How many matches did you strike to set the house on fire? A. I just struck some searching it. Q. He poured the coal oil on and you set it on fire? A. Yes, sir. Q. Where did you go then? A. Home. Q. What did you do with the gun? A. Took it home with me. Q. What time did you get home? A. About 8:30 I guess. Q. Did you go to bed? A. Yes, sir. Q. Did you sleep? A. Yes. Q. What did you do the next morning? A. Went to town and came back and went hunting. Q. With the same gun? A. Yes. Q. What did you do with the gun? A. He came and got it. Q. Where did you buy the shells? A. W. A. Hall store. Q. How much did you give for them? A. A quarter. Q. Where did you go after he came and got the gun? A. I come on back home to Hugo. Q. When were you arrested? A. It was over a week after that. Q. Did you ever see this other negro, Vanzell, any more? A. I saw him in jail. Q. Did you talk about this case? A. Yes, in Fort Towson. Q. You both agreed not to tell it? A. Yes, sir. Q. Is this statement you have made true? A. Yes, sir. Q. This was made of your own free will and accord? A. Yes, sir. Q. Any threats been made on you? A. No, sir. Q. This statement and confession has been made by you voluntarily? A. Yes, sir. Q. You have absolutely told me the truth? A. Yes, sir, I have. Q. That's all.

"(Signed)    W. D. Lyons.

"Witnesses:

"Van Raulston
"R. H. Marshall
"J. F. Dunn
"State of Oklahoma, Pittsburg County, ss.

"Before me, a notary public in and for the County and State aforesaid, personally appeared before me W. D.

Lyons, and acknowledged to me that he made, published and declared, signed and fingerprinted the within and foregoing statement and confession consisting of eleven (11) pages, and that said statement and confession was made by him of his own free will and accord, freely and voluntarily, without threat of promise, reward, leniency or remuneration, on this the 23rd day of January, 1940, in the office of the warden of the Oklahoma State Penitentiary, at McAlester, Oklahoma.

Seal                    (Signed)        "John D. Seal,
                                        Notary Public.

"My com. exp. Feb. 3rd, 1943."

The evidence of Warden Dunn with reference to the taking of this confession is as follows:

"Q. Your name is Jess Dunn? A. Yes. Q. Are you the same witness who testified here yesterday? A. Yes. Q. Mr. Dunn, I hand you again state's Exhibit nine and ask you to state what that is. A. This is a statement that W. D. Lyons made in the warden's office in the Oklahoma State Penitentiary. This is his signature which he written himself. This is his thumb print that he put on there himself. Q. Is that signature and thumb print on each page? A. It is on each page of the statement. Q. Was it signed voluntarily by the defendant, or was he forced to sign it? A. Absolutely voluntary. Q. Did you tell him his rights when he signed that statement? A. I did. Q. Detail just how the statement came to be signed and the circumstances surrounding it. A. He and Van Raulston and a boy named Marshall came into my office along, I guess, about 9:30 in the evening, came in and sat down, and I talked to the boy. I knew him before he came up there. And I asked him had he told the truth about this case, and he said he hadn't. I asked him did he want to tell the truth about this case, and he said he did. Then I told him his rights in the case. I told him what statement he made would be used against him, and for him not to make a statement unless he voluntarily wanted to and it would be his own free will, and voluntary if he made

a statement. Then I asked him did he want to make a statement, and he said he did. And I asked him a few questions, then I called in my secretary and told him that I was going to take down what he said and asked him did he want to sign it. He said he did. After the statement was taken, he got up and signed those pages and put his thumb print on each page. All voluntary things, and the office was as quiet as this is now. He was as calm and cool as he is now. His treatment in my office was the treatment he has now in this court-room. Q. Where is your office located in the main building there? A. It is in the northwest corner of the administration building. Q. How many windows do you have in the office? A. We have four windows. Q. Was W. D. Lyons sitting down all the time you were questioning him? A. Yes, all except one time. Q. What did he do then? A. I had got down to the question of where he shot the man. I asked him the question of how far the man was from the window when he shot. He stood up from his seat and stepped off about two and a half or three feet from the window. I asked him where he shot the man. He put his thumb up there in the left side and said about there, and was just as cool and calm as he is right now. Q. How long had he been there when you questioned him? A. Before I taken the statement? Q. Yes. A. I will say something like 20 or 30 minutes. We sat and talked before I called my secretary in and had him to take the statement. Q. He hadn't at that time been placed in a cell, had he? A. No. Q. Will you read that statement to the jury, Mr. Dunn. A. I haven't got my glasses, if you will read it. Q. Who was present, Mr. Dunn, at the time this statement was read to him? A. Van Raulston and Mr. Marshall, and the chaplain of the penitentiary. Q. Were they all present at the time you read the statement to him? A. They were. Q. And at the time he signed it? A. Yes. Q. And marked it with his thumb print? A. That is right. Q. Will it be all right for me to read the statement? A. I can get some glasses. Q. I will read it. We now offer this confession in evidence."

And on cross-examination, Mr. Dunn testified:

"Q. Mr. Dunn, how long have you been warden of the penitentiary? A. About four and one-half years. I have been at the penitentiary about ten years. Q. Are the prison camps in the country under your jurisdiction? A. Yes. Q. Do you know of a prison camp in this vicinity near Fort Towson? A. There was. Q. At the time immediately prior to your talk to Lyons, were you making an investigation down there? A. I came to Fort Towson and to Hugo, and made an investigation of the camp. Q. Prior to the time you talked to W. D. Lyons, is it not true that some members of that camp, some inmates, had been under investigation concerning this same murder? A. There was. Q. Mr. Dunn, you say this is verbatim of what Lyons said as the results of your questions? A. Absolutely. Q. You didn't mean this preliminary part: 'I, W. D. Lyons, a negro, at 8:15 o'clock p.m., on this the 23rd day of January, 1940.' That wasn't said by him, was it? A. That was read to him. Q This preliminary part, starting: 'I, W. D. Lyons,' and ending 'I swear to be the whole truth, without reservation.' A. That isn't his language and that part of the statement was prepared and read to him, and those questions are his own language of his own answers. Q. Going back to the last page where it speaks of making this of his own free will and accord, freely and voluntarily, without threat or promise, reward, leniency or remuneration, that is not his language, is it? A. I asked him those questions myself. Q. He didn't volunteer the words like 'remuneration'? A. I asked him those words and he answered. Q. Did you ask him if he knew what remuneration meant? A. I didn't ask him. I never let any prisoner make a statement in my office until I tell him his rights, when there is anything involved in the nature of any crime that might be where there is a penitentiary offense involved. Q. If your honor please, I move that the whole thing be stricken from the record. It is not in response to the question of mine at all, but is a voluntary statement from the witness. The Court: Read the question asked by counsel. Reporter: Did you ask him if he knew what 'remuneration' meant? The Court: The answer of the warden would not be in

response to the question. The answer to the question would be. A. I answered about like that, that I didn't ask him that. Q. You did not ask him if he knew what the word remuneration meant? A. No, I didn't. Q. Did you have in your possession any purported statement made by Lyons prior to this time? A. I did not. Q. Did you have in your possession any reports of investigations of this case concerning Lyons? A. Not concerning Lyons. Q. Did you know of the facts in the case? A. I didn't know anything about the facts in the case of Lyons at all. Q. Did you know anything about the facts of the murder, the burning, and so forth? A. I had been here and had been to the place, but I didn't know any facts in the case. Q. As a matter of fact, how many former inmates of the prison farm there had been arrested concerning this case? A. I would not be able to answer your question. Something like four or five or six possibly. Maybe more, I don't know. Q. That had been arrested? A. They had some of them in jail when I was down there. Q. You knew nothing of the arrest of this man until you saw him, is that right? A. I had heard they had him arrested but that was all. Q. You hadn't heard that he had made a statement? A. I had not. Q. When he came into your office approximately at 9:30 why did you ask him if he wanted to make a statement? A. Because I had known the boy. He had done time there before. Q. You asked him whether he wanted to make a statement? A. I asked him had he told the truth about what happened down there. Q. In what interest were you asking him that question? A. Because the interest I wanted to find out if he had anything to do with the case. Q. A personal interest of yours as a citizen, as warden, as a State officer? A. I will say as a state official. Q. Is that a common practice in the penitentiary? A. Yes. Q. To ask men brought there if they want to make statements? A. I think our citizens should be interested in a case like that. Q. The question I am trying to get you to answer is whether you usually do that? A. When they are brought to the penitentiary in a case like that I generally help with the case all I can. Q. You mean a case like that? A. Yes. Q. Can you

explain what you mean by 'case like that?' A. I mean a case that was as brutal and as notorious, and a case where there had been three people murdered and burned. That was my idea as a citizen, to do what I could, not as an official, but as a citizen. Q. You had not discussed this with anyone prior to this? A. Only when the boys came in they told me they had Lyons arrested for it. Q. Did you discuss the question of taking a statement from him with any other officer? A. No, sir. Q. Had you talked to Mr. Cheatwood prior to this time about this case? A. Not about this boy. I had talked to him several times about the case, but not about Lyons. Q. You hadn't talked to anyone in state official capacity, and I include the county officials concerning a statement? A. Not about Lyons, but I had talked several times about the case. I had been here two or three different times on this case, but at that time Lyons was not in the picture. Q. You don't know anything about what happened to Lyons prior to the time you saw him? A. I do not. Q. Can you say now, or could you say then, that he hadn't been subjected to any threats, or violence, prior to that time? A. I couldn't answer that. I know he wasn't up there. Q. You don't know what happened before he got there? A. I do not. Q. In your office I ask you are there bars there? A. There is. Q. Do you have handcuffs hanging on the walls? A. No. Q. You did not have handcuffs in sight while Lyons was there? A. There are no handcuffs in my office, or even in any office. Q. You are positive that Mr. Van Raulston did not strike him in your presence? A. Absolutely not. I don't permit or allow anyone to strike a prisoner in my office. Q. In your presence, Mr. Van Raulston did not make any threats of any kind? A. Mr. Van Raulston, I dont't think, ever spoke a word. I don't think either of the other gentlemen ever said a word when they came into the office when the boy was making his statement. Q. All these questions are from you without suggestion from anyone? A. Absolutely. Q. The statement was not typed or signed right then, was it? A. It was taken in shorthand. Q. And typed out? A. Yes. Q. Where was Lyons during the time it was being typed out? A. He was

sitting in my office. Q. The entire time? A. He might have got up and went out of the office. I don't remember. Of course, there are two offices, three offices. Q. He wasn't taken to a cell? A. He wasn't taken to the cell until the statement was signed. Q. He was not taken to the kitchen to eat? A. I believe he might have gone down there to eat while they were typing. I won't be positive. I think I sent him to get something to eat during the time the statement was being typed, but I won't be positive. Q. The next question, if you don't mind my going through the question a little better. A. That is all right. Q. Did you know whether Lyons had an attorney at the time you talked to him? Did you ask him? A. He didn't have an attorney at that time. Q. I notice on page eight, this by you: 'What was she saying when you got the axe.' What prompted you to ask that question? Where did you learn about an axe? A. I had been down here, as I told you, on three or four different occasions. I had been out to the scene. I knew that I had talked with the boy before the statement was made, as I said before. I talked to him a few minutes and went into the case, and asked him after I had talked to him, did he still want to make a statement, and if so, I would call my secretary. He promptly answered he wanted to tell the truth about it and make it short. Q. But I mean whether he told you voluntarily anything about the axe. Who raised that question? A. I had talked to him. He told me about the axe before the statement was made. Q. He had told you about the axe before that? A. Yes. Q. These questions here where you, if you know what I mean by leading questions? A. Yes. Q. They were not out of your own mind, but would come up from your talk prior to that time? A. He had outlined the case to me before I called my secretary in to take the statement down. When I got through with him, then I told him: 'W. D., if you want to make a statement I'll call my secretary in and have him take it down if you want to sign the statement, and if you want to tell the truth about the case.' Q. Did he say he wanted to sign his statement? A. He said he wanted to tell the truth and would sign the statement. Q. Was there a suggestion that the fingerprints

here be put on it? A. I always put a fingerprint on when I put the name of every prisoner of every case that comes. Q. As a matter of fact, who suggested the fingerprint be put on? A. That is a matter carried on in the penitentiary. There is no prisoner that ever signs a document of that kind unless he fingerprints it. Q. What I am trying to get in this particular case, who suggested to Lyons that he put his fingerprints on it? A. I did when he signed his name. And he has been printed before. (Objection made, and the ruling of the court: That will be stricken. That voluntary statement will be stricken.) Q. Lyons had given you a coherent story before this was taken down, was that right? A. Yes. Q. Why didn't you let him dictate it that way instead of questions and answers? Was there a reason? A. They didn't have any reason. Q. But you preferred the question and answer method? A. I asked him the questions and he answered. I also asked him did he want me to ask the questions or did he want to make the statement himself, and he said go ahead. Q. That does not appear here. A. That was before the statement was made. Q. That was about 9:30 when the officers brought him in? A. I wouldn't be positive, between eight and ten, something like that. Maybe 9:30. I am not positive when the time was. I had been home and came back to the penitentiary. Q. About how long was this preliminary discussion with him? A. About 10 or 15 minutes. Q. And the stenographer was brought in promptly then? A. Yes. Q. And when was the chaplain brought in? A. He was brought in after the statement was made. Then the statement, the chaplain read the statement to Lyons, and asked Lyons was that statement true and in his own words, and he said it was. He asked Lyons if he wanted to sign it and he told him he did. I handed him a pen and he signed the statement. Q. About what time was this? A. I guess around nine or 9:30. I don't know the exact time it was. Q. You say it was somewhere between eight or nine-thirty when he was brought in? A. He was there an hour, or an hour and 20 minutes, I couldn't say. Q. For the entire transaction, signing and fingerprinting, is what I want to know. I

don't care about the times between. A. I would say it was after 9 o'clock when they got through. Q. He was brought in before nine then? A. Yes. Q. If I understood that he was brought in about 9:30, then you are not positive? A. I am not positive just what time he was brought in the office. But it was around between 8 and 9 or 9:30. Q. And it was approximately how long, an hour, hour and a half, or how long was it that the whole transaction took place? A. It took possibly an hour and 20 minutes. Q. Was Mr. Van Raulston there the whole time? A. He was. Q. And Mr. Marshall? A. He was. Q. Then what happened after the statement was taken? A. The statement was typewritten. Q. After it was signed, then what? A. He was sent to the cell. Q. Where was the cell? A. We have a cell on the fourth floor of the cell house where we keep safe-keeping of prisoners, which the counties built. It does not belong to the penitentiary, and we have cells that we put them in. Q. And he wasn't by any chance taken to the basement? A. He was not. Q. Is there where the death row is, in the basement? A. The death row is on the first floor. Q. He was not put in the death row in any of those cells? A. No, not in there. Q. And was not taken to a cell where he could see the electric chair? A. No. Q. You are positive? A. I am. Q. Did you take him to the fourth floor or send him? A. I sent him by the sergeant. Q. How many electrocutions have you supervised at this time? Speaking of the time you talked to W. D. Lyons? A. I think about 14. Q. About fourteen prior to that time? Did you hold any position before you were warden? A. I was assistant warden. Q. Did you handle that as assistant warden? A. The warden always supervises electrocutions. Q. And you have had fourteen up to that time? A. Of mine. Q. Did you talk about that fact with Lyons? A. No. Q. Concerning how many men you had electrocuted? A. Absolutely not. Q. You did not? A. I did not. Q. Did you at any time threaten Lyons in any manner? A. As I stated before, I don't threaten any prisoner in asking a statement in a matter like this. I did not. Q. You answer that you did not. A. Absolute-

ly. Q. Did you say anything to him of the possibility of a life sentence? A. There was not a mention about what he might get, or would get, or otherwise. Q. No mention made of that? A. No. Q. I want to come back to the time you were here investigating. As I understand you were investigating—just what? A. The prisoners were under my supervision. They had a camp down here seven or eight miles. I don't know how far it was to where the camp was, but only a short distance, and they had some of the boys in jail. I came to look into the matter and see what accusations they had them for, and see if they were mixed up in the deal. Q. Subsequent to that time was there not a change in the administration of the camp, the officials in charge of the camp? A. Do you mean before this happened? Q. Around during that time? A. There was not at that time. Q. Was there shortly thereafter? A. I made one shortly thereafter. Q. Was there, or was there not, wide newspaper publicity to the effect that inmates of the camp were charged with this murder? A. There was newspaper publicity. There had been some arrests for it. Q. Wasn't the newspaper publicity condemning the management, and the arrangement whereby the men got out from the camp? A. There was. Q. That was during the time that Lyons was brought to you? A. That is right."

And on re-direct examination:

"Q. Do you ever have prisoners in the camps or in the walls to violate the law? A. Yes. Q. What do you do when they violate the law? A. They are prosecuted like any other citizens of the United States. I go into the case, or help with the officials, and the county attorney, or whoever it might be. Q. Do you ever try to conceal violations of the law in your institution by inmates? A. I do not. I have taken a good many cases to the county attorney and helped him."

And on re-cross examination:

"Q. Do you know Vernon Cheatwood, special investigator for the Governor? A. Yes. Q. Do you remember him coming to the penitentiary after W. D. Lyons was

incarcerated? A. I don't remember whether I was there or not when he came. Q. You know he was there a time or two? A. He has been to the penitentiary a lot of times. Q. But after W. D. Lyons was taken there? A. Yes. Q. Do you know of him going and talking to W.D. Lyons while he was there? A. I couldn't say whether he talked to W. D. Lyons or not. Q. You don't know whether he talked, nor what took place when Cheatwood talked to him, do you? A. I don't know whether he talked to Lyons or not. Q. Nor what might have taken place if he did? A. I have said that I didn't know whether he talked to Lyons or not. Q. And are therefore not in a position to know what took place if he did. Is that right? A. That is right."

In the Chambers Case, supra, the judgment and sentence was for the death penalty. The decision of the lower court was three to one, Judge Brown dissenting, and the Supreme Court of the United States in giving the facts in the case quote from his able opinion. In his opinion, Justice Black comes to the rightful conclusion that the due process provision of the Fourteenth Amendment to the Constitution of the United States was intended "to guarantee procedural standards adequate and appropriate, then and thereafter, to protect, at all times, people charged with, or suspected of crime by those holding positions of favor and authority." [309 U.S. 227, 60 S. Ct. 477, 84 L. Ed. 716.]

We again emphasize that if the state in the instant case had introduced in evidence confession No. 1, and relied upon the same, following the opinion in the Chambers Case, we would unhesitatingly reverse this case. We have referred to the other four cases decided by the Supreme Court of the United States, but the facts in the Chambers Case are more nearly parallel to the facts in the case at bar, as to the first confession, and a much stronger case than the others. For the sake of brevity we refrain

from a discussion of the facts in the other cases. All of these cases carried with them the death penalty, and in the instant case only a life sentence is involved. This sentence was evidently given by the jury by reason of the circumstances under which confession No. 1 was given, for had they not done so they would evidently have given a death penalty verdict in this case. In making this statement we take into consideration the recognized rule that the question of guilt or innocence should not be considered when deciding as to the admissibility of a statement as voluntary or involuntary.

In an elaborate annotation in 85 A.L.R., beginning on page 870, the question of voluntary and involuntary confessions is fully discussed. As a preliminary to this note, the annotator quoted from the case of State v. Sherman, 35 Mont. 512, 90 P. 981, 982, 119 Am. St. Rep. 869, these words:

"In the words of Holloway, J., in State v. Sherman, 1907, 35 Mont. 512, 90 P. 981, 119 Am. St. Rep. 869, it has often been said that 'no subject of the law is in more inextricable confusion than that relating to the admission in evidence of confessions made by one accused of crime.' And the particular question under annotation, involved in the law relating to confessions, is no exception to the statement. In its final analysis the question becomes this: Is an accused person against whom his confession has been admitted in evidence, after preliminary examination into voluntariness by the court, entitled to have the jury instructed, inter alia, that they must determine whether the confession was made voluntarily, and reject it entirely from their consideration if they determine that it was not voluntarily made?

"That question can be conclusively and directly decided only when such an instruction has been requested by the defendant and refused by the court. Unless the state has the right of appeal for error of the court in giv-

ing an instruction to which exception has been taken, any method of raising the question except that stated above must necessarily result only in a dictum. Consequently, of the large number of cases in which the question has been discussed and which are included in this annotation, only a part are actual decisions of the question."

The main question then considered in the note is whether the proposition of the confession being voluntary or involuntary is a question of law exclusively to be decided by the court, or a question of fact to be presented to and decided by the jury. With reference to this, the annotator in the note states:

"In twelve states the rule obtaining is that the question whether a confession is voluntary so as to justify its admission in evidence is a matter solely of the admissibility of evidence, and is addressed solely to the court. The jury may hear the evidence in regard to the circumstances under which the confession was obtained, if the court admits it, but only for the purpose of determining whether the defendant made the confession and whether the matter asserted therein is the truth. Thus, the jury may determine the weight to be given to a confession, but they may not reject it as evidence if they believe it to be the truth even though they believe that it was not voluntarily made."

The annotator lists the states as holding that the question as to whether the confession is voluntary or involuntary is exclusively a question of law for the court as Alabama, Colorado, Florida, Illinois, Indiana, Maryland, Minnesota, Mississippi, Montana, New Jersey, North Carolina, and North Dakota. And those holding that it is ultimately a question for the jury as Arizona, Arkansas, California, District of Columbia, Georgia, Iowa, Kentucky, Massachusetts, Michigan, Nebraska, New Mexico, New York, Pennsylvania, South Carolina, South Dakota, Texas, and Utah. The states considered as being doubtful are Kansas, Maine, Missouri, Nevada,

Ohio, Oklahoma, Oregon, Rhode Island, Washington, West Virginia, Wisconsin, Wyoming; and the District of Columbia and the United States.

It will be noted that the State of Oklahoma is listed among the doubtful states.

When the annotator comes to a discussion of the cases from this state, he says:

"Notwithstanding that the question under annotation has never been presented to the Oklahoma court for a direct decision, there are numerous expressions by the court on the subject. However, because of the ambiguity of the language used, it cannot be definitely said that the court has adopted one view or the other, although it would seem that the court leans toward the rule that the jury ultimately determines whether a confession is voluntary, and either disregards it or considers it as they determine that question."

After this statement, the following cases from this court are cited and quoted from: Kirk v. Territory, 1900, 10 Okla. 46, 60 P. 797; Berry v. State, 1910, 4 Okla. Cr. 202, 111 P. 676, 31 L.R.A., N.S., 849; Mays v. State, 1920, 19 Okla. Cr. 102, 197 P. 1064; Simonson v. State, 1926, 33 Okla. Cr. 113, 242 P. 279; Howington v. State, 1926, 35 Okla. Cr. 352, 250 P. 941; Williams v. State, 1927, 38 Okla. Cr. 1, 258 P. 1066; Edwards v. State, 1930, 46 Okla. Cr. 77, 288 P. 359; Lucas v. State, 1924, 26 Okla. Cr. 23, 221 P. 798; Hix v. State, 1925, 29 Okla. Cr. 20, 232 P. 123; Cooper v. State, 1925, 31 Okla. Cr. 165, 237 P. 865.

In addition to these cases, we desire to call attention to the following later cases in which this question has been considered: Wood v. State, 72 Okla. Cr. 364, 116 P. 2d 728, 729; Williams v. State, 65 Okla. Cr. 336, 86 P. 2d 1015; Pressley v. State, 71 Okla. Cr. 436, 112 P. 2d 809.

We have carefully read all of the above cases in order to consider their applicability to the facts in the instant case, and notwithstanding the statement that, "it cannot be definitely said the court has adopted one view or the other." it seems to us that a definite conclusion has been reached and adhered to from the early decision in the Kirk case by the Territorial Supreme Court to the last case of Wood v. State, supra. As suggested by the annotator in commenting upon one of the cases, there may have been some expressions that were ambiguous or contradictory, yet a careful reading of all the cases will reveal that this court has universally followed this rule with reference to the determination of the question of confessions, and as to their admissibility. It is stated briefly in the early case of Kirk v. Territory, supra [10 Okla. 46, 60 P. 807], when the court said:

"We think the correct practice, and the one sustained by sound reason and weight of authority, is that when testimony is offered to prove a confession, and objection is made to the competency of the evidence, the court should withdraw the jury, and hear all the evidence offered on the objection, both for and against the competency, and decide the question in the absence of the jury. If the court holds the confessions are not proper to be shown, then no prejudice can result from such action. On the other hand, if the court holds the confessions admissible, then the jury should be recalled; and, if the defendant desires, all the evidence relating to the competency of such confessions, the circumstances under which they were given, the condition of mind of the defendant, and all other facts affecting or tending to affect the weight or credit of such confessions should be permitted to go to the jury."

All of the cases above cited and all those decided since the organization of this court have followed this general rule. It has been the universal practice in this state, when a confession is attempted to be introduced in evidence,

and objection is made that the same was not voluntary, the jury is withdrawn and all the evidence surrounding the making of the confession is presented to the court, out of the presence of the jury, and the court decides as a matter of law whether the confession was made voluntarily or involuntarily. If it is decided that it was voluntary, it is admitted in evidence. If involuntary, the court denies its right to be admitted. Up to this point, it comes clearly in accord with the states holding that the question is exclusively one of law. But our court has then said that when the confession is admitted in evidence that all of the facts surrounding the giving of the confession may be presented to the jury, and that when this is done, the court should instruct the jury upon the question of the confession, and advise them if they find it was not voluntarily made that the same should not by them be considered. In the cases above cited, it has been universally held that the burden of proof is upon the defendant to establish that the confession was involuntary.

In the instant case, the exact procedure outlined in the above cases was followed. When the confession of defendant made at the penitentiary before the warden was presented, the trial court excused the jury and heard the evidence of the defendant and of the state with reference to the securing of the confession, both in the jail at Hugo and at the penitentiary. When this hearing had been completed, the court decided that the first confession at the jail in Hugo was involuntary and inadmissible, stating as his reason therefor that the evidence revealed that a pan of human bones had been placed in the lap of the defendant. The state had made no attempt to introduce the first confession in evidence, but this testimony was offered by the defendant. The court, after hearing all the evidence decided that confession No. 2 made at the

State Penitentiary was voluntary, and therefore admissible in evidence.

There had been a direct conflict between the testimony of the defendant, and that of the state, the defendant testifying that he had been mistreated before and at the time both confessions were made. This was denied by the officers who were present when the first confession was made, and by the warden and those present when the second confession was taken. The court then called the jury and permitted the second confession made before the warden at the penitentiary to be introduced in evidence, and then permitted the defendant to introduce in the presence of the jury all of the evidence with reference to what transpired both before and at the time of the giving of both the first and second confessions. This for the reason heretofore stated.

The court then followed the procedure outlined in the cases above cited, and gave to the jury instruction No. 8, as follows:

"The state has introduced in evidence before you certain statements claimed to have been made by the defendant after his arrest, and while he was in the custody of the officers of the law, which statements are relied on in part by the state to establish the guilt of the defendant of the offense charged.

"You are instructed that confessions and statements made by one charged with an offense must be carefully scrutinized and received with great caution. Yet when they are made voluntarily and deliberately, such confessions and statements may be considered as evidence for and against the person making them, the same as any other evidence. But if a confession or statement is made by one in custody under such circumstances as show that he was induced to make the same by punishment, intimidation, or threats on the part of the persons who had him in charge, or

that show that the confessions and statements were not freely and voluntarily made, then they cannot be considered as evidence against the person making them.

"In this case, if you do not find that the confessions and statements by the defendant, while in custody, were freely and voluntarily made, and made without punishment, intimidation, or threats on the part of the persons having the defendant in custody, then you must disregard such statements or confessions as affording any evidence against the defendant whatever.

"But the mere fact that the confession or statements, if any were made by the defendant, were made in answer to questions propounded to him while under arrest or in custody, will not be sufficient to exclude such statements or confessions as evidence, or prevent you from considering the same, if the statements, if any, were made freely and voluntarily."

After deciding as a matter of law that confession No. 2 was admissible, the court gave the jury an opportunity to pass upon the question as to whether the facts justified the finding that it was voluntarily given. Many cases hold that this is not only proper, but that the finding of the jury after such instruction is given is conclusive. See the annotation in 85 A.L.R. page 870, and cases there cited; also 20 Am. Jur. page 453, section 533 et seq.

We have carefully examined defendant's requested instruction No. 2. It presents a request that the jury be instructed that if the confession had been obtained by reason of fear and the conduct of the officers, it would not be a voluntary confession and should not be considered by them.

This principle was fully presented to the jury in instruction No. 8, hereinbefore quoted. In this connection it may be stated that the court permitted the defendant to introduce all of the evidence surrounding the first con-

fession, giving the jury the opportunity to pass upon the question as to whether the defendant was under fear by reason of any treatment he had received at the time he made either confession No. 1, when at the jail in Hugo, or confession No. 2 at the State Penitentiary.

Referring to the statement made in Wharton on Criminal Evidence, we find this expression:

"But the question arises as to whether a confession made subsequent to such inadmissible confession is itself admissible. This question, as in the case of any other confession, is one for the judge to decide, and each case must be determined on its own facts."

Applying this statement to the facts here, it clearly appears that the second confession was made at a time and under such change of conditions that it was clearly a voluntary one, and any fear that may have existed when the first confession was made had been removed before the second confession was made.

The statement further says:

"If the court concludes from all the facts and attendant circumstances that the improper influence had ceased to operate or had been removed, the subsequent confession is admissible."

It is evident that the trial court after hearing the evidence out of the presence of the jury came to this conclusion. The fact that the witness Van Raulston was present at the time the second confession was taken was considered in the light of all the evidence heard by the court. The confession itself, which was signed by the defendant, states that the same was made "of my own free will and accord, without threat of punishment, duress, fraud, coercion, promise of leniency, or any consideration whatsoever," and is acknowledged to the same effect be-

fore a notary public, who was the chaplain of the penitentiary. Warden Dunn testified:

"I asked did he want to tell the truth about this case, and he said he did. Then I told him his rights in the case. I told him what statement he made would be used against him, and for him not to make a statement unless he voluntarily wanted to and it would be his own free will and voluntary if he made a statement. Then I asked him did hewant to make a statement and he said he did."

Under this evidence, and the evidence of the others present to the same effect, it will readily be observed that the trial court did not err in coming to the conclusion that the state had overcome any presumption that might have prevailed that any previous influence or treatment of defendant existed at the time of the second confession. The contention that Van Raulston was present and participated at the time of the securing of the first confession is not supported by the record. The evidence reveals that he was present during a part of the time defendant was being questioned, but that he was in and out, attending to his other duties as deputy sheriff, and that he did not participate in the questioning, and knew very little about it. The fact that he had been injured in an automobile accident and was unable to drive refutes the testimony of defendant that he beat him for three hours at McAlester before he made his second confession. He was physically unable to do this. Certainly the conclusion of the trial court was in compliance with the terms of the law as announced in Wharton on Criminal Evidence. In addition to this, the court then submitted to the jury the issue under proper instructions to determine the question of the statement being voluntarily made, as hereinbefore set forth. The jury under this instruction had the right to consider all of the evidence and the verdict they rendered reveals that they undoubtedly did so.

Counsel in their brief state, after citing a number of cases to substantiate the proposition that when a confession is made under improper influences that the presumption arises as to the subsequent confessions flows from the same influence, that:

"It has also been clearly established that this presumption must be overcome before the subsequent confession can be received in evidence."

Admitting this as true, it clearly appears that the state has met this burden as to the second confession. The evidence of the defendant is the only evidence to the contrary. His testimony is contradicted by the physical facts, and by every witness present; and the statement which he makes is so unreasonable that the jury evidently did not believe it. If this be true, it may then be said that the presumption above stated had been overcome.

Counsel then say:

"In order for the subsequent confession to be admissible in evidence it must be affirmatively shown that the influence which produced the prior confession has ceased. Evidence to overcome or to rebut this presumption must be very clear, strong and satisfactory; if there is any doubt on this point, the confession must be excluded."

The evidence of the state, as above related, fully complies with this statement, and the evidence of the defendant himself to a great extent establishes this fact. It is revealed by the record that he had twice prior to this time been confined in the State Penitentiary for the commission of a felony. This court, from long experience, knows that one who has been twice confined in the penitentiary becomes more familiar with the making of statements or confessions, and thereby more able to take care of himself in the making of the same. King v. State, 108 Neb. 428, 187 N.W. 934; State v. Middleton, 69 S.C. 72,

48 S.E. 35; Shepherd v. State, 31 Neb. 389, 47 N.W. 1118; People v. Trybus, 219 N.Y. 18, 113 N.E. 538; Laughlin v. Commonwealth, 37 S.W. 590, 18 Ky. Law Rep. 640; Nix v. State, 149 Ga. 304, 100 S.E. 197; Turner v. State, 72 Tex. Cr. R. 649, 163 S.W. 705.

This brings us to the question that: "Statements made to Sheriff Duncan at McAlester should not have been admitted in evidence."

There is not much effort on the part of the defendant to substantiate this assignment of error. It is merely contended that the influence of the prior confession had not been removed at this time, "two or four days later." This witness, Cap Duncan, was employed as a sergeant at the penitentiary. He had formerly been a sheriff of Choctaw county. He testified that some three or four days after the defendant had been received at the penitentiary, he and a guard by the name of Bert Crawford, who was acquainted with the defendant, went to his cell and talked with him; that defendant told them that he and Van Bizzell killed the Rogers family by shooting them. No objection or exception was taken to this testimony by defendant. It was never denied by defendant. There is absolutely no proof to show that defendant was in any way mistreated or under any influence or fear at the time of making this statement. It seemed to be clearly voluntary on the part of the defendant to one with whom he was acquainted. Certainly there was no error in the admission of this evidence. In the cases cited by defendant the facts are not applicable to the facts in the instant case.

In his motion for a new trial and in his petition in error filed in this court, the defendant did not allege as error the fact that defendant did not have an attorney to represent him in his preliminary examination. In de-

fendant's brief, two statements are made with reference thereto: "On the next day they carried him up on the fourth floor of the penitentiary where he remained until the preliminary hearing. During this time Lyons did not have an attorney to represent him."And: "Nevertheless, W. D. Lyons, without representation by counsel, was subjected to a preliminary hearing and was returned to the state penitentiary."

Also in the amicus curiae brief filed by the American Civil Liberties Union, it is stated: "At no time until after the preliminary hearing did the prisoner, an ignorant Negro boy, have the benefit of counsel."

In neither of the briefs is this proposition discussed, and no authorities are cited in support thereof. The above statements are the only references made thereto. The record does not reveal all that transpired at the time of the preliminary hearing. It reveals that a complete transcript of these proceedings was in the hands of the attorneys for defendant at the trial. Certain parts were read with reference to the introduction of the testimony of a witness who was not present at the trial. By these questions it is revealed that the codefendant, Van Bizzell, had counsel of his own choice, and that this attorney examined the witnesses at the preliminary, for both of the defendants, though he did not represent the defendant. In the absence of the record it is presumed that the proceedings before the magistrate were regular. The questions asked reveal that defendant was informed by the magistrate of his right to have counsel as provided by the statute of this state. §§2793 and 2929, O.S. 1931, Tit. 22 §§ 251 and 464, O.S. Ann. 1941.

We presume for the reasons above stated counsel for defendant did not see proper to introduce in evidence

the whole transcript of the proceedings at the preliminary examination, and especially that part with reference to the appointment of counsel for defendant. And for the further reason that they concluded that it was not a violation of the Fourteenth Amendment to the Constitution of the United States, the due process clause, for one not to have an attorney appointed to represent him at a preliminary examination. It is only a violation of this provision when counsel is not appointed at the final trial.

The more recent decisions of the Supreme Court of the United States, with which we are sure counsel for defendant is familiar, have dealt with the question of the right of a defendant to the appointment of counsel as provided by the Sixth and Fourteenth Amendments to the Constitution of the United States. These cases fully discuss and give a complete history of these amendments, and of the rules of the common law and its development by the different states. It is unnecessary to quote from these decisions. They may be read by those who desire. We here cite them: Powell v. Alabama, 287 U.S. 45, 53 S. Ct. 55, 77 L. Ed. 158, 84 A.L.R. 527; Johnson v. Zerbst, 304 U.S. 458, 58 S.Ct. 1019, 82 L. Ed. 1461; and Betts v. Brady, 316 U.S. 455, 62 S. Ct. 1252, 86 L. Ed. 1595.

After a careful reading of these and many other cases, we have come to the conclusion that the due process of law clause is not violated by reason of the fact that counsel was not appointed by the magistrate at the preliminary hearing, and especially where he had able counsel at his trial, and they were given ample opportunity to consult with him freely and plenty of time to prepare his defense.

The record reveals that defendant was charged with the commission of this crime on the 31st day of December, 1939. He was arrested on the 11th day of January, 1940.

His preliminary examination was not held until the 28th of January, 1940. His actual trial was not begun until January 27, 1941. The record reveals that counsel who represented him at the trial filed with the clerk of the court on the 5th day of December, 1940, notice of his intention to prove an alibi at his trial. This was 52 days before his trial commenced. His counsel had opportunity to converse with him. The defendant was not rushed into a trial without adequate preparation, but was given a delay of over one year. At the time of his trial, he was represented by able counsel. Every right in this trial was safely guarded. Briefs filed in this case have been elaborate. His case was presented to this court by able oral arguments by both of the attorneys who represented him at his trial. The trial court gave the defendant every consideration and right to which he was entitled. This record presents as fair a trial as we have ever observed.

A brief has been filed by the attorneys who represented the defendant at his trial, one of whom was from New York City as a representative of the National Association for the Advancement of Colored People; and able counsel of New York City representing the American Civil Liberties Union have filed a brief amicus curiae. We make reference to the same. This brief is short, but emphasizes the questions presented by the brief of the defendant. We refer to some of the statements made therein for the reason that it asserts "the conviction of W. D. Lyons in the court below represents a flagrant violation of the civil rights of a person accused of crime."

As a basis for this statement, four propositions are urged:

"(1) Apart from the alleged confessions, there is insufficient evidence in the record to base a criminal con-

viction. We do not believe that this proposition can be open to serious debate in the mind of any conscientious observer."

The record does not bear out this assertion. The evidence introduced at this trial which we have not quoted as to the defendant securing the gun, purchasing the shells, the testimony of the ballistic expert, the conduct of the defendant and his presence with the gun in close proximity to the scene of the homicide both prior to and after the killing as testified to by a number of witnesses, and his statement to Cap Duncan, which is clearly admissible, would be sufficient cause for any jury to convict him of the commission of this crime.

A new trial, as we see it, could have no other outcome than that of finding the defendant guilty, and with a great probability that the result would be that defendant would be given a death penalty sentence, rather than one of life imprisonment.

"(2) The first alleged confession, procured during the night and early morning of January 22-23, 1940, was extorted by use of physical and mental torture deliberately applied by responsible officials of the State of Oklahoma."

This first confession, as has been stated, was not introduced in evidence by the state, and no attempt was made to introduce the same. Our views with reference thereto have been fully stated.

The third contention has reference to the admission of the second confession, because it was made in the presence of Van Raulston, who, it is claimed, was present when the first confession was obtained. As has been stated, the record does not justify this statement. While present at the time defendant was questioned, he did not participate therein, and was only present at the jail

where the questioning was in progress. We have heretofore discussed the merits of the second confession.

"(4) At no time until after the preliminary hearing did the prisoner, an ignorant Negro boy, have the benefit of counsel."

This proposition has been heretofore discussed. The record of the proceedings at the preliminary examination was not introduced in evidence.

The amicus curiae brief in a concise manner follows the argument of defendant's brief, but attempts by argument to infer that the testimony of Hon. Jess Dunn, the warden of the penitentiary, was untrue and that of the defendant true. This was a question for the court to first decide, and by proper instruction was submitted to the jury for their consideration. The argument that the second confession was prepared "in advance of the meeting" does not seem plausible in view of the testimony of all the witnesses present.

That part of the brief which condemns the placing of the pan of bones in the lap of defendant, and any mistreatment of him by any officer, or permitting the same to be done while in his custody, if such was a fact, meets with our approval. And as heretofore stated, we unhesitatingly condemn such practice, and reiterate that if the first confession had been introduced in evidence by the state, we would reverse this case for a new trial. But as to the second and third confessions, it is clear to us that any fear under which defendant may have been suffering had been removed and that these confessions and statements were made at a time and place, and under conditions that rendered them purely voluntary.

By reason of its importance, the questions involved, and the fact that it involves the right and liberty of a

member of the negro race, who is not only poor but uneducated, has caused us to give this case much painstaking and careful consideration. This court, from its creation and organization, as will be reflected by its decisions, has ever been mindful and zealous in the protection of the rights of the citizens of this state, especially of those who are poor, indigent and uneducated and often unable to protect themselves. At the same time, we have protected the rights of all the citizens of this great commonwealth, to the end that the life and liberty of its citizens may ever be guarded from the assassin's hands. This rule applies to the humblest citizen who goes to his meager tenant home in the countryside with the members of his family, and to the most wealthy citizen of the state, who resides with his family in a mansion. One's color, race or previous condition of servitude should not deprive him of any right in this court. Equality before the law has ever been our motto.

A careful consideration of this record clearly reveals that this defendant deliberately murdered Elmer Rogers and his wife in a cruel and brutal manner on the night of December 31, 1939, and after robbing them, poured coal oil on the walls and set fire to their home, and burned to death their innocent child, who was asleep; and that only by a miraculous escape their other two children were saved.

As heretofore stated, a reversal of this case, and the granting of a new trial would in our opinion be of no benefit to this defendant. A new trial, as we see it, could have no other outcome than that of finding the defendant guilty, and with a great probability that the result would be that defendant would be given a death penalty sentence, rather than one of life imprisonment.

250

We have come to the conclusion that the judgment and sentence of the district court of Choctaw county should be affirmed, and it is so ordered.

JONES, P. J., and DOYLE, J., concur.

DOYLE, Judge (dissenting on petition for rehearing). The petition for rehearing is in part as follows:

"Section 2760, 22 O.S. 1941 § 176, provides that where the crime is a felony the officer making the arrest must take the defendant to the magistrate issuing the warrant or some other magistrate in the same county.

"Plaintiff in error was arrested on January 11, 1940. Instead of following the Oklahoma statutes and taking Lyons before a magistrate, he was taken immediately to the sheriff's office where he was severely beaten. (C.M. 106, 107, 108, 349, 148)

"Eleven days thereafter he received the severe beating and mistreatment leading to the first 'confession', which beating and treatment were condemned both by the trial judge and by this court. It should be noted that the first 'confession' was obtained in the county prosecutor's office, in the court house and on the same floor where the court room is located. Lyons was not brought into the court room before a magistrate. He was carried around the county to different places and then to the penitentiary. Lyons was not returned to the court house to be carried before a magistrate until after he had made the other 'confession'. It is quite obvious that Lyons was taken to the penitentiary for the purpose of attempting to so change the factual situation as to attempt to bolster another confession. Otherwise he would have been carried before the magistrate before being carried to McAlester.

"There is no dispute as to the following facts: Lyons was 'arrested' by civilians without a warrant. No warrant appears in the record. Lyons was not formally charged with the crime until his appearance before a magistrate on January 27, 1940. He did not have the advice of

counsel until February 4, 1940. All of the 'confessions' were secured prior to that time. This is the chronology:

"Lyons was arrested January 11, 1940 (C.M. 236)

" 'Confession' obtained at Hugo morning of January 23, 1940 (313-314)

" 'Confession' signed 2:00 P. M. same afternoon (C. M. 129)

" '2d. Confession' obtained at McAlester same night (C.M. 130)

" '3d. Confession' obtained at McAlester two days later (C.M. 228)

"Lyons before magistrate without counsel January 27, 1940 (C.M. 140)

"First advice of counsel on February 4, 1940 (C.M. 369)

"Information filed August 29, 1940 (C.M. 2)

"Arraignment December 30, 1940 (C.M. 5)

"Trial started January 27, 1941 (C.M. 7.)

"The confessions were introduced by county prosecutor Horton who was present during the time Lyons was beaten and who in his cross examination at the trial admitted he was present when Lyons was beaten and who likewise knew that the other confessions were obtained before Lyons was carried before a magistrate and before he had opportunity to secure counsel.

"The trial court also was acquainted with the facts that these confessions were obtained before Lyons was carried before a magistrate and in violation of the statutes of Oklahoma. This court likewise is acquainted with the facts apparent on the face of the record. The failure of the officials of the State of Oklahoma to take the necessary corrective steps to protect the fundamental rights of plaintiff in error to elementary due process of law, as prescribed by the statutes of the State of Oklahoma, is a denial

of due process of law as guaranteed by the Fourteenth Amendment to the United States Constitution.

"The United States Supreme Court in two opinions rendered this year have redefined the meaning of due process of law. In the case of McNabb v. United States, [318 U.S. 332, 63 S. Ct. 608, 615] 87 L. Ed. [—] (decided March 1, 1943), regarding the question concerning the admission of confessions obtained by federal officers, Mr. Justice Frankfurter speaking for the Supreme Court, stated:  *  *  *  'The circumstances in which the statements admitted in evidence against the petitioners were secured reveal a plain disregard of the duty enjoined by Congress upon federal law officers. Freeman and Raymond McNabb were arrested in the middle of the night at their home. Instead of being brought before a United States Commissioner or a judicial officer, as the law requires, in order to determine the sufficiency of the justification for their detention, they were put in a barren cell and kept there for fourteen hours. For two days they were subjected to unremitting questioning by numerous officers. Benjamin's confession was secured by detaining him unlawfully and questioning him continuously for five or six hours. The McNabbs had to submit to all this without the aid of friends or the benefit of counsel. The record leaves no room for doubt that the questioning of the petitioners took place while they were in the custody of the arresting officers and before any order of commitment was made. Plainly, a conviction resting on evidence secured through such a flagrant disregard of the procedure which Congress has commanded cannot be allowed to stand without making the courts themselves accomplices in willful disobedience of law. Congress has not explicitly forbidden the use of evidence so procured. But to permit such evidence to be made the basis of a conviction in the federal courts would stultify the policy which Congress has enacted into law.'

"It is further stated:

"Mr. Justice Frankfurter, in the opinion for the Supreme Court, said that the use of these confessions

violated the due process clause of the Fifth amendment, for the reason that: '\* \* \* The record leaves no room for doubt that the questioning of the petitioners took place while they were in the custody of the arresting officers and before any order of commitment was made. Plainly, a conviction resting on evidence secured through such a flagrant disregard of the procedure which Congress has commanded cannot be allowed to stand without making the courts themselves accomplices in willful disobedience of law. \* \* \*' ([318 U.S. 332, 63 S. Ct. 615] 87 L. Ed. [—].)

"Applying this rule to the admitted facts in the instant case there is a clear duty upon this court to reverse the conviction, as was done in the McNabb case.

"It is further stated: 'This court, in its opinion, points out, on page 7 [138 P. 2d on page 148], that Lyons "the next morning was taken to the scene of the crime". All the evidence in the case points to the fact that Lyons was taken to the scene of the crime on the same morning as the confession was obtained. On page 15 [138 P. 2d on page 152] of the opinion it is pointed out that "Here the second confession which was introduced in evidence was made at a time far removed from the first confession, and at a place where the defendant knew that he was secure from violence." In the first place, the second confession was not obtained at a time "far removed" from the first confession. The first confession was signed at 2 o'clock in the afternoon. The second confession was obtained, according to Warden Dunn, on the same day at either 8:15 or 9:30 o'clock.'

"It is further stated:

" 'As to the "confession" to Cap Duncan, no effort was made to show that the influence of the prior 'confessions' had been removed. Lyons was still without counsel, had not been before a magistrate and was still in the custody of law enforcement officers. To him Cap Duncan likewise was a law enforcement officer. The influence of Cheatwood was still present and subsequent to that

time Cheatwood came to the penitentiary with other officers from Hugo.

" 'It is clear, therefore, that the "confessions" used were obtained while Lyons was still under the influence of the threats and force used to obtain the first 'confession'. The use of said "confessions" was a denial of due process of law guaranteed by the Fourteenth amendment to the United States Constitution.'

"It is further urged that the refusal to give requested Instruction No. 2 is reversible error, for the reason:

"This court in its opinion pointed out, on page 43 [138 P. 2d on page 165], that 'counsel in their brief state, after citing a number of cases to substantiate the proposition that when a confession is made under improper influences that the presumption arises as to the subsequent confessions flows from the same influence, that: 'It has also been clearly established that this presumption must be overcome before the subsequent confession can be received in evidence.' Admitting this as true * * *' Plaintiff in error requested instruction no. 2 as an accurate statement of the very same proposition as advanced by this court in its opinion. The trial court's instruction did not mention the presumption at all. Plaintiff's requested instruction no. 2 was a request for an instruction on this presumption. The opinion of this court, as stated above, justifies completely the reasons for granting plaintiff in error's instruction no. 2, and failure to do so is reversible error.

## "Conclusion

"It is respectfully urged that this court grant a rehearing in this matter, in order that the State of Oklahoma may not be guilty of failure to take the necessary corrective steps to prevent the denial of due process of law to plaintiff in error."

The law of the land guarantees to every person charged with crime, whether guilty or innocent, regardless of race or color, whether of high or low degree, whether

rich or poor, a fair and impartial trial according to the due and orderly course of the law, and it is the duty resting upon the courts to see that the guaranty of such a trial shall be upheld and sustained.

It is undoubtedly the law that the accused in any criminal action is entitled as a matter of right, to require in the first instance a compliance with the ordinary rules and forms of law that secure to him a fair and legal trial.

Our laws have been made for observance and not for evasion, and it is the duty of trial courts in the administration of the law to see that the accused, whether guilty or innocent, shall have a fair trial according to the due and orderly course of the law, and this duty is emphasized in a capital case.

It has been well said that the law is not designed to be a swift engine of oppression and vengeance, but it was and is designed to try and convict men only after due hearing and a fair trial.

Under the provisions of the Code of Criminal Procedure, sections 2484, 2485, O.S. 1921, 22 O.S. 1941 §§ 251, 252, "the magistrate must immediately inform him of the charge against him, and of his right to the aid of counsel in every state of the proceedings" and " 'he must also allow to the defendant a reasonable time to send for counsel, and adjourn the examination for that purpose.' And, under section 2590, [22 O.S. 1941 § 464], providing that before arraignment the defendant 'must be informed by the court that it is his right to have counsel before being arraigned, and must be asked if he desire the aid of counsel. If he desires, and is unable to employ counsel, the court must assign counsel to defend him.' Held, that while these rights may be waived by the defendant, they cannot be

denied by the courts." Polk v. State, 26 Okla. Cr. 283, 224 P. 194.

The state attempts to safeguard the life and liberty of citizens, and as one of the steps in that direction secures to them, if prosecuted for crime, the constitutional right to be heard by counsel, which includes the right of accused to consult with counsel at every stage of the proceedings, whether imprisoned or admitted to bail. Mullen v. State, 28 Okla. Cr. 218, 230 P. 285.

In Howington v. State, 30 Okla. Cr. 243, 235 P. 931, 933, we said:

"The uniform holding of the courts is that, in capital cases, a plea of guilty can only be entered after the defendant has been fully advised by the court of his rights and the consequences of his plea, and, where it appears on appeal from a judgment of conviction that the defendant has been denied a right guaranteed by the Constitution, such showing requires a reversal, unless the record clearly shows that the right was waived, or that no injury could have resulted to the accused by reason of such denial.

"A denial of a constitutional right to a person prosecuted for a crime is prima facie prejudicial.   *   *   *

"In cases of this kind, where the defendant is charged with a capital offense, he should have the advantage of every right which the law secures to him upon his trial. A fair and impartial administration of justice is one of the most sacred rights of the citizen, and it is the duty of the courts to see that the constitutional rights of the accused shall not be violated; however guilty he may be, he is entitled to a fair trial according to the due and orderly course of the law."

In Ex parte Barnett, 67 Okla. Cr. 300, 94 P. 2d 18, 19, this court held:

"Whether one accused of crime has waived his right to the assistance of counsel for his defense must depend in each case upon the particular facts and circumstances surrounding that case, including the background, experience, and conduct of the accused." Held further: "Habeas corpus is an available remedy to one who has, without having effectively waived his constitutional right to the assistance of counsel, been convicted and sentenced and to whom expiration of time has rendered relief by an application for a new trial or by appeal unavailable." Citing Powell v. Alabama, 287 U.S. 45, 53 S. Ct. 55, 77 L. Ed. 158, 84 A. L. R. 527.

Also quoting from the opinion delivered by Mr. Justice Black for the Supreme Court of the United States, in the case of Johnson v. Zerbst, 304 U.S. 458, 58 S. Ct. 1019, 82 L. Ed. 1461.

In Miller v. State, 13 Okla. Cr. 176, 163 P. 131, L.R.A. 1917D, 383, it is said:

"When a prisoner is compelled by duress to make self-disserving statements, such statements cannot be put in evidence against him."

"To render statements made by a prisoner admissible, they must be entirely free and voluntary; that is, must not be abstracted by any sort of threats or violence, nor obtained by any direct or implied promises. It is not important to determine whether they amount to a confession of guilt, or merely declarations of fact tending to show guilt."

The record shows defendant's requested instruction No. 2 reads:

"Gentlemen: You are instructed that if you find that at the time the confession was obtained at McAlester, that the defendant was still suffering from the treatment that he had received in the county attorney's office or elsewhere by the officers that had him in custody or was

induced to sign the confession by reason of fear as a result of the conduct of the officers that had him in custody and that by reason thereof said confession was not a free and voluntary confession, you are not to consider the confession, or any of the evidence therein contained.

"Asked for by the defendant and refused, exception allowed.

"Geo. R. Childers, Judge."

Endorsed:

"Filed in Open Court
"Choctaw County, Okla.
"Jan. 30, 1941
"Haskell Floyd, Court Clerk."

The well established rule is that, if a confession has once been obtained through illegal influence, it must be clearly shown that such influence has been removed before a subsequent confession can be received in evidence.

The rule is stated in 20 Am. Jur. Evidence, sec. 487, as follows:

"Once a confession made under improper influences is obtained, the presumption arises that a subsequent confession of the same crime flows from the same influences, even though made to a different person than the one to whom the first was made. However, a confession otherwise voluntary is not affected by the fact that a previous one was obtained by improper influence if it is shown that these influences are not operating when the later confession is made. In other words, the presumption that a subsequent confession of the same crime flows from the same improper influences which induced a prior confession is not a conclusive one and may be overcome by proof that the influences present at the prior confession did not operate on the subsequent confession. The evidence to rebut the presumption that the subsequent confession, like the original confession, is involuntary must be presented by the prosecution and must be given at the time the subsequent confession is offered in evidence, provided

the court is then cognizant that the accused has made a prior involuntary confession. The evidence to rebut the presumption must be clear and convincing, however. If the facts regarding the securing of an involuntary confession are not known to the court when the later confession is admitted, the evidence must be presented whenever the court becomes cognizant of the former confession, in which event it is for the jury to decide whether the subsequent confession was the result of influence which made the prior one involuntary."

A defendant in a criminal prosecution is entitled to a legal trial, conducted in accordance with the rules of law; and the question of his guilt or innocence should be determined upon legal evidence.

Upon a careful review of the record, the authorities cited in the petition for rehearing, and under all of the decisions of this court, so far as I can recall, I do not believe that the plaintiff in error has been tried and convicted in accordance with law, and did not have that fair and impartial trial which the law guarantees to one charged with crime.

For the reasons indicated in my opinion, the petition for rehearing should be allowed, the judgment of conviction reversed, and the cause remanded to the trial court with direction to grant a new trial.

I therefore enter my dissent from the affirmance of the judgment appealed from.